(Slip Opinion) OCTOBER TERM, 2005 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CLARK *v.* ARIZONA

### CERTIORARI TO THE COURT OF APPEALS OF ARIZONA

No. 05–5966. Argued April 19, 2006—Decided June 29, 2006

Petitioner Clark was charged with first-degree murder under an Arizona statute prohibiting "[i]nten[tionally] or knowing[ly]" killing a police officer in the line of duty. At his bench trial, Clark did not contest that he shot the officer or that the officer died, but relied on his own undisputed paranoid schizophrenia at the time of the incident to deny that he had the specific intent to shoot an officer or knowledge that he was doing so. Accordingly, the prosecutor offered circumstantial evidence that Clark knew the victim was a police officer and testimony indicating that Clark had previously stated he wanted to shoot police and had lured the victim to the scene to kill him. In presenting the defense case, Clark claimed mental illness, which he sought to introduce for two purposes. First, he raised the affirmative defense of insanity, putting the burden on himself to prove by clear and convincing evidence that, in the words of another state statute, "at the time of the [crime, he] was afflicted with a mental disease or defect of such severity that [he] did not know the criminal act was wrong." Second, he aimed to rebut the prosecution's evidence of the requisite *mens rea,* that he had acted intentionally or knowingly to kill an officer.

Ruling that Clark could not rely on evidence bearing on insanity to dispute the *mens rea,* the trial court cited the Arizona Supreme Court's decision in *State* v. *Mott,* 187 Ariz. 536, 931 P. 2d 1046, which refused to allow psychiatric testimony to negate specific intent and held that Arizona does not allow evidence of a mental disorder short of insanity to negate the *mens rea* element of a crime. As to his insanity, then, Clark presented lay testimony describing his increasingly bizarre behavior over the year before the shooting. Other lay and expert testimony indicated, among other things, that Clark thought that "aliens" (some impersonating government agents) were

trying to kill him and that bullets were the only way to stop them. A psychiatrist testified that Clark was suffering from paranoid schizophrenia with delusions about "aliens" when he killed the officer, and concluded that Clark was incapable of luring the officer or understanding right from wrong and was thus insane at the time of the killing. In rebuttal, the State's psychiatrist gave his opinion that Clark's paranoid schizophrenia did not keep him from appreciating the wrongfulness of his conduct before and after the shooting. The judge then issued a first-degree murder verdict, finding that in light of that the facts of the crime, the expert evaluations, Clark's actions and behavior both before and after the shooting, and the observations of those who knew him, Clark had not established that his schizophrenia distorted his perception of reality so severely that he did not know his actions were wrong.

Clark moved to vacate the judgment and life sentence, arguing, among other things, that Arizona's insanity test and its *Mott* rule each violate due process. He claimed that the Arizona Legislature had impermissibly narrowed its insanity standard in 1993 when it eliminated the first of the two parts of the traditional *M'Naghten* insanity test. The trial court denied the motion. Affirming, the Arizona Court of Appeals held, among other things*,* that the State's insanity scheme was consistent with due process. The court read *Mott* as barring the trial court's consideration of evidence of Clark's mental illness and capacity directly on the element of *mens rea.*

*Held:*

1. Due process does not prohibit Arizona's use of an insanity test stated solely in terms of the capacity to tell whether an act charged as a crime was right or wrong. Pp. 6–15.

(a) The first part of the landmark English rule in *M'Naghten's Case* asks about cognitive capacity: whether a mental defect leaves a defendant unable to understand what he was doing. The second part presents an ostensibly alternative basis for recognizing a defense of insanity understood as a lack of moral capacity: whether a mental disease or defect leaves a defendant unable to understand that his action was wrong. Although the Arizona Legislature at first adopted the full *M'Naghten* statement, it later dropped the cognitive incapacity part. Under current Arizona law, a defendant will not be adjudged insane unless he demonstrates that at the time of the crime, he was afflicted with a mental disease or defect of such severity that he did not know the criminal act was wrong. Pp. 6–7.

(b) Clark insists that the side-by-side *M'Naghten* test represents the minimum that a government must provide, and he argues that eliminating the first part " 'offends [a] principle of justice so rooted in the traditions and conscience of our people as to be ranked as funda-

mental,' " *Patterson* v. *New York,* 432 U. S. 197, 202. The claim entails no light burden, and Clark does not carry it. History shows no deference to *M'Naghten* that could elevate its formula to the level of fundamental principle, so as to limit the traditional recognition of a State's capacity to define crimes and defenses. See, *e.g., Patterson, supra,* at 210. Even a cursory examination of the traditional Anglo-American approaches to insanity reveals significant differences among them, with four traditional strains variously combined to yield a diversity of American standards. Although 17 States and the Federal Government have adopted recognizable versions of the *M'Naghten* test with both its components, other States have adopted a variety of standards based on all or part of one or more of four variants. The alternatives are multiplied further by variations in the prescribed insanity verdict. This varied background makes clear that no particular formulation has evolved into a baseline for due process, and that the insanity rule, like the conceptualization of criminal offenses, is substantially open to state choice. Pp. 7–12.

(c) Nor does Arizona's abbreviation of the *M'Naghten* statement raise a proper claim that some constitutional minimum has been shortchanged. Although Arizona's former statement of the full *M'Naghten* rule was constitutionally adequate, the abbreviated rule is no less so, for cognitive incapacity is relevant under that statement, just as it was under the more extended formulation, and evidence going to cognitive incapacity has the same significance under the short form as it had under the long. Though Clark is correct that applying the moral incapacity test (telling right from wrong) does not necessarily require evaluation of a defendant's cognitive capacity to appreciate the nature and quality of the acts charged against him, his argument fails to recognize that cognitive incapacity is itself enough to demonstrate moral incapacity, so that evidence bearing on whether the defendant knew the nature and quality of his actions is both relevant and admissible. In practical terms, if a defendant did not know what he was doing when he acted, he could not have known that he was performing the wrongful act charged as a crime. The Arizona appeals court acknowledged as much in this case. Clark adopted this very analysis in the trial court, which apparently agreed when it admitted his cognitive incapacity evidence for consideration under the State's moral incapacity formulation. Clark can point to no evidence bearing on insanity that was excluded. Pp. 12–15.

2. The Arizona Supreme Court's *Mott* rule does not violate due process. Pp. 15–38.

(a) *Mott* held that testimony of a professional psychologist or psychiatrist about a defendant's mental incapacity owing to mental disease or defect was admissible, and could be considered, only for its

bearing on an insanity defense, but could not be considered on the element of *mens rea*. Of the three categories of evidence that potentially bear on *mens rea*—(1) everyday "observation evidence" either by lay or expert witnesses of what Clark did or said, which may support the professional diagnoses of disease and in any event is the kind of evidence that can be relevant to show what was on Clark's mind when he fired his gun; (2) "mental-disease evidence," typically from professional psychologists or psychiatrists based on factual reports, professional observations, and tests about Clark's mental disease, with features described by the witness; and (3) "capacity evidence," typically by the same experts, about Clark's capacity for cognition and moral judgment (and ultimately also his capacity to form *mens rea*)—*Mott* imposed no restriction on considering evidence of the first sort, but applies to the latter two. Although the trial court seems to have applied the *Mott* restriction to all three categories of evidence Clark offered for the purpose of showing what he called his inability to form the required *mens rea*, his objection to *Mott*'s application does not turn on the distinction between lay and expert witnesses or the kinds of testimony they were competent to present. Rather, the issue here is Clark's claim that the *Mott* rule violates due process. Pp. 15–25.

(b) Clark's *Mott* challenge turns on the application of the presumption of innocence in criminal cases, the presumption of sanity, and the principle that a criminal defendant is entitled to present relevant and favorable evidence on an element of the offense charged against him. Pp. 25–30.

(i) The presumption of innocence is that a defendant is innocent unless and until the government proves beyond a reasonable doubt each element of the offense changed, including the mental element or *mens rea*. The modern tendency is to describe the *mens rea* required to prove particular offenses in specific terms, as shown in the Arizona statute requiring the State to prove that in acting to kill the victim, Clark intended to kill a law enforcement officer on duty or knew that the victim was such an officer on duty. As applied to *mens rea* (and every other element), the force of the presumption of innocence is measured by the force of the showing needed to overcome it, which is proof beyond a reasonable doubt that a defendant's state of mind was in fact what the charge states. See *In re Winship*, 397 U. S. 358, 361–363. Pp. 25–26.

(ii) The presumption of sanity dispenses with a requirement that the government include as an element of every criminal charge an allegation that the defendant had the capacity to form the *mens rea* necessary for conviction and criminal responsibility. Unlike the presumption of innocence, the presumption of sanity's force varies

across the many state and federal jurisdictions, and prior law has recognized considerable leeway on the part of the legislative branch in defining the presumption's strength through the kind of evidence and degree of persuasiveness necessary to overcome it, see *Fisher* v. *United States,* 328 U. S. 463, 466–476. There are two points where the sanity or capacity presumption may be placed in issue. First, a State may allow a defendant to introduce (and a factfinder to consider) evidence of mental disease or incapacity for the bearing it can have on the government's burden to show *mens rea.* Second, the sanity presumption's force may be tested in the consideration of an insanity defense raised by a defendant. Insanity rules like *M'Naghten* and the variants noted above are attempts to define or indicate the kinds of mental differences that overcome the presumption of sanity or capacity and therefore excuse a defendant from customary criminal responsibility, see, *e.g., Jones* v. *United States,* 463 U. S. 354, 373, n. 4, even if the prosecution has otherwise overcome the presumption of innocence by convincing the factfinder of all the elements charged beyond a reasonable doubt. The burden a defendant raising the insanity issue must carry defines the strength of the sanity presumption. A State may, for example, place the burden of persuasion on a defendant to prove insanity as the applicable law defines it, whether by a preponderance of the evidence or to some more convincing degree. See, *e.g., Leland* v. *Oregon*, 343 U. S. 790, 798. Pp. 26–29.

(iii) A defendant has a due process right to present evidence favorable to himself on an element that must be proven to convict him. Evidence tending to show that a defendant suffers from mental disease and lacks capacity to form *mens rea* is relevant to rebut evidence that he did in fact form the required *mens rea* at the time in question. Thus, Clark claims a right to require the factfinder in this case to consider testimony about his mental illness and his incapacity directly, when weighing the persuasiveness of other evidence tending to show *mens rea*, which the prosecution has the burden to prove. However, the right to introduce relevant evidence can be curtailed if there is a good reason for doing so. For example, trial judges may "exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes* v. *South Carolina,* 547 U. S. \_\_\_, \_\_\_. And if evidence may be kept out entirely, its consideration may be subject to limitation, which Arizona claims the power to impose here. Under state law, mental-disease and capacity evidence may be considered only for its bearing on the insanity defense, and it will avail a defendant only if it is persuasive enough to satisfy the defendant's burden as defined by the terms of that defense. Such evidence is thus being channeled or restricted to one issue; it is not being excluded en-

tirely, and the question is whether reasons for requiring it to be channeled and restricted satisfy due process's fundamental fairness standard. Pp. 29–30.

(c) The reasons supporting the Arizona rule satisfy due process. Pp. 30–38.

(i) The first such reason is Arizona's authority to define its presumption of sanity (or capacity or responsibility) by choosing an insanity definition and placing the burden of persuasion on criminal defendants claiming incapacity as an excuse. Consistent with due process, a State can require defendants to bear that burden, see *Leland, supra,* at 797–799, and Clark does not object to Arizona's decision to require persuasion to a clear and convincing degree before the presumption of sanity and normal responsibility is overcome. If a State is to have this authority in practice as well as in theory, it must be able to deny a defendant the opportunity to displace the sanity presumption more easily when addressing a different issue during the criminal trial. Yet just such an opportunity would be available if expert testimony of mental disease and incapacity could be considered for whatever a factfinder might think it was worth on the *mens rea* issue. The sanity presumption would then be only as strong as the evidence a factfinder would accept as enough to raise a reasonable doubt about *mens rea*; once reasonable doubt was found, acquittal would be required, and the standards established for the insanity defense would go by the boards. What counts for due process is simply that a State wishing to avoid a second avenue for exploring capacity, less stringent for a defendant, has a good reason for confining the consideration of mental disease and incapacity evidence to the insanity defense. Pp. 30–32.

(ii) Arizona's rule also serves to avoid confusion and misunderstanding on the part of jurors. The controversial character of some categories of mental disease, the potential of mental-disease evidence to mislead, and the danger of according greater certainty to capacity evidence than experts claim for it give rise to risks that may reasonably be hedged by channeling the consideration of such evidence to the insanity issue on which, in States like Arizona, a defendant has the burden of persuasion. First, the diagnosis may mask vigorous debate within the psychiatric profession about the very contours of the mental disease itself. See, *e.g., Jones, supra,* at 364–365, n. 13. Though mental-disease evidence is certainly not condemned wholesale, the consequence of this professional ferment is a general caution in treating psychological classifications as predicates for excusing otherwise criminal conduct. Next, there is the potential of mental-disease evidence to mislead jurors (when they are the factfinders) through the power of this kind of evidence to suggest that a defendant suffer-

Syllabus

ing from a recognized mental disease lacks cognitive, moral, volitional, or other capacity, when that may not be a sound conclusion at all. Even when a category of mental disease is broadly accepted and the assignment of a defendant's behavior to that category is uncontroversial, the classification may suggest something very significant about a defendant's capacity, when in fact the classification tells little or nothing about the defendant's ability to form *mens rea* or to exercise the cognitive, moral, or volitional capacities that define legal sanity. The limits of the utility of a professional disease diagnosis are evident in the dispute between the two testifying experts in this case; they agree that Clark was schizophrenic, but they reach opposite conclusions on whether his mental disease left him bereft of cognitive or moral capacity. Finally, there are particular risks inherent in the opinions of the experts who supplement the mental-disease classifications with opinions on incapacity: on whether the mental disease rendered a particular defendant incapable of the cognition necessary for moral judgment or *mens rea* or otherwise incapable of understanding the wrongfulness of the conduct charged. Unlike observational evidence bearing on *mens rea*, capacity evidence consists of judgment, and judgment is fraught with multiple perils. Although such capacity judgments may be given in the utmost good faith, their potentially tenuous character is indicated by the candor of the defense expert in this very case. He testified that Clark lacked the capacity to appreciate the circumstances realistically and to understand the wrongfulness of what he was doing, but he admitted that no one knew exactly what was on Clark's mind at the time of the shooting. Even when an expert is confident that his understanding of the mind is reliable, judgment addressing the basic categories of capacity requires a leap from the concepts of psychology, which are devised for thinking about treatment, to the concepts of legal sanity, which are devised for thinking about criminal responsibility. Pp. 33–38.

(d) For these reasons, there is also no cause to claim that channeling evidence on mental disease and capacity offends any "'principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,'" *Patterson, supra,* at 202. P. 38.

Affirmed.

SOUTER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS, and ALITO, JJ., joined, and in which BREYER, J., joined except as to Parts III–B and III–C and the ultimate disposition. BREYER, J., filed an opinion concurring in part and dissenting in part. KENNEDY, J., filed a dissenting opinion, in which STEVENS and GINSBURG, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 05–5966

## ERIC MICHAEL CLARK, PETITIONER *v.* ARIZONA

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF ARIZONA, DIVISION ONE

[June 29, 2006]

JUSTICE SOUTER delivered the opinion of the Court.

The case presents two questions: whether due process prohibits Arizona's use of an insanity test stated solely in terms of the capacity to tell whether an act charged as a crime was right or wrong; and whether Arizona violates due process in restricting consideration of defense evidence of mental illness and incapacity to its bearing on a claim of insanity, thus eliminating its significance directly on the issue of the mental element of the crime charged (known in legal shorthand as the *mens rea*, or guilty mind). We hold that there is no violation of due process in either instance.

I

In the early hours of June 21, 2000, Officer Jeffrey Moritz of the Flagstaff Police responded in uniform to complaints that a pickup truck with loud music blaring was circling a residential block. When he located the truck, the officer turned on the emergency lights and siren of his marked patrol car, which prompted petitioner Eric Clark, the truck's driver (then 17), to pull over. Officer Moritz got out of the patrol car and told Clark to stay where he was. Less than a minute later, Clark shot the

officer, who died soon after but not before calling the police dispatcher for help. Clark ran away on foot but was arrested later that day with gunpowder residue on his hands; the gun that killed the officer was found nearby, stuffed into a knit cap.

Clark was charged with first-degree murder under Ariz. Rev. Stat. Ann. §13–1105(A)(3) (West Supp. 2005) for intentionally or knowingly killing a law enforcement officer in the line of duty.[1] In March 2001, Clark was found incompetent to stand trial and was committed to a state hospital for treatment, but two years later the same trial court found his competence restored and ordered him to be tried. Clark waived his right to a jury, and the case was heard by the court.

At trial, Clark did not contest the shooting and death, but relied on his undisputed paranoid schizophrenia at the time of the incident in denying that he had the specific intent to shoot a law enforcement officer or knowledge that he was doing so, as required by the statute. Accordingly, the prosecutor offered circumstantial evidence that Clark knew Officer Moritz was a law enforcement officer. The evidence showed that the officer was in uniform at the time, that he caught up with Clark in a marked police car with emergency lights and siren going, and that Clark acknowledged the symbols of police authority and stopped. The testimony for the prosecution indicated that Clark had intentionally lured an officer to the scene to kill him, having told some people a few weeks before the incident that he wanted to shoot police officers. At the close of the State's evidence, the trial court denied Clark's motion for judgment of acquittal for failure to prove intent to kill a

_____

[1] Section 13–1105(A)(3) provides that "[a] person commits first degree murder if . . . [i]ntending or knowing that the person's conduct will cause death to a law enforcement officer, the person causes the death of a law enforcement officer who is in the line of duty."

law enforcement officer or knowledge that Officer Moritz was a law enforcement officer.

In presenting the defense case, Clark claimed mental illness, which he sought to introduce for two purposes. First, he raised the affirmative defense of insanity, putting the burden on himself to prove by clear and convincing evidence, §13–502(C) (West 2001), that "at the time of the commission of the criminal act [he] was afflicted with a mental disease or defect of such severity that [he] did not know the criminal act was wrong," §13–502(A).[2] Second, he aimed to rebut the prosecution's evidence of the requisite *mens rea*, that he had acted intentionally or knowingly to kill a law enforcement officer. See, *e.g.*, Record in No. CR 2000–538 (Ariz. Super. Ct.), Doc. 374 (hereinafter Record).

The trial court ruled that Clark could not rely on evidence bearing on insanity to dispute the *mens rea*. The court cited *State* v. *Mott*, 187 Ariz. 536, 931 P. 2d 1046 (en banc), cert. denied, 520 U. S. 1234 (1997), which "refused to allow psychiatric testimony to negate specific intent," 187 Ariz., at 541, 931 P. 2d, at 1051, and held that "Ari-

——————

[2] Section 13–502(A) provides in full that
"A person may be found guilty except insane if at the time of the commission of the criminal act the person was afflicted with a mental disease or defect of such severity that the person did not know the criminal act was wrong. A mental disease or defect constituting legal insanity is an affirmative defense. Mental disease or defect does not include disorders that result from acute voluntary intoxication or withdrawal from alcohol or drugs, character defects, psychosexual disorders or impulse control disorders. Conditions that do not constitute legal insanity include but are not limited to momentary, temporary conditions arising from the pressure of the circumstances, moral decadence, depravity or passion growing out of anger, jealousy, revenge, hatred or other motives in a person who does not suffer from a mental disease or defect or an abnormality that is manifested only by criminal conduct."

A defendant found "guilty except insane" is committed to a state mental health facility for treatment. See §13–502(D).

zona does not allow evidence of a defendant's mental disorder short of insanity . . . to negate the *mens rea* element of a crime," *ibid.*[3]

As to his insanity, then, Clark presented testimony from classmates, school officials, and his family describing his increasingly bizarre behavior over the year before the shooting. Witnesses testified, for example, that paranoid delusions led Clark to rig a fishing line with beads and wind chimes at home to alert him to intrusion by invaders, and to keep a bird in his automobile to warn of airborne poison. There was lay and expert testimony that Clark thought Flagstaff was populated with "aliens" (some impersonating government agents), the "aliens" were trying to kill him, and bullets were the only way to stop them. A psychiatrist testified that Clark was suffering from paranoid schizophrenia with delusions about "aliens" when he killed Officer Moritz, and he concluded that Clark was incapable of luring the officer or understanding right from wrong and that he was thus insane at the time of the killing. In rebuttal, a psychiatrist for the State gave his opinion that Clark's paranoid schizophrenia did not keep him from appreciating the wrongfulness of his conduct, as shown by his actions before and after the shooting (such as circling the residential block with music blaring as if to lure the police to intervene, evading the police after the shooting, and hiding the gun).

At the close of the defense case consisting of this evidence bearing on mental illness, the trial court denied Clark's renewed motion for a directed verdict grounded on failure of the prosecution to show that Clark knew the

---

[3] The trial court permitted Clark to introduce this evidence, whether primarily going to insanity or lack of intent, "because it goes to the insanity issue and because we're not in front of a jury." App. 9. It also allowed him to make an offer of proof as to intent to preserve the issue on appeal. *Ibid.*

victim was a police officer.[4]  The judge then issued a special verdict of first-degree murder, expressly finding that Clark shot and caused the death of Officer Moritz beyond a reasonable doubt and that Clark had not shown that he was insane at the time.  The judge noted that though Clark was indisputably afflicted with paranoid schizophrenia at the time of the shooting, the mental illness "did not . . . distort his perception of reality so severely that he did not know his actions were wrong."  App. 334.  For this conclusion, the judge expressly relied on "the facts of the crime, the evaluations of the experts, [Clark's] actions and behavior both before and after the shooting, and the observations of those that knew [Clark]."  *Id.*, at 333.  The sentence was life imprisonment without the possibility of release for 25 years.

Clark moved to vacate the judgment and sentence, arguing, among other things*,* that Arizona's insanity test and its *Mott* rule each violate due process.  As to the insanity standard, Clark claimed (as he had argued earlier) that the Arizona Legislature had impermissibly narrowed its standard in 1993 when it eliminated the first part of the two-part insanity test announced in *M'Naghten's Case*, 10 Cl. & Fin. 200, 8 Eng. Rep. 718 (1843).  The court denied the motion.

The Court of Appeals of Arizona affirmed Clark's conviction, treating the conclusion on sanity as supported by enough evidence to withstand review for abuse of discretion, and holding the State's insanity scheme consistent with due process.  App. 336.  As to the latter, the Court of Appeals reasoned that there is no constitutional requirement to recognize an insanity defense at all, the bounds of

---

[4] Clark did not at this time make an additional offer of proof, as contemplated by the trial court when it ruled that it would consider evidence bearing on insanity as to insanity but not as to *mens rea*.  See n. 3, *supra*.

which are left to the State's discretion. Beyond that, the appellate court followed *Mott*, reading it as barring the trial court's consideration of evidence of Clark's mental illness and capacity directly on the element of *mens rea*. The Supreme Court of Arizona denied further review.

We granted certiorari to decide whether due process prohibits Arizona from thus narrowing its insanity test or from excluding evidence of mental illness and incapacity due to mental illness to rebut evidence of the requisite criminal intent. 546 U. S. ___ (2005). We now affirm.

## II

Clark first says that Arizona's definition of insanity, being only a fragment of the Victorian standard from which it derives, violates due process. The landmark English rule in *M'Naghten's Case*, 10 Cl. & Fin. 200, 8 Eng. Rep. 718 (1843), states that

> "the jurors ought to be told . . . that to establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." 10 Cl. & Fin., at 210, 8 Eng. Rep., at 722.

The first part asks about cognitive capacity: whether a mental defect leaves a defendant unable to understand what he is doing. The second part presents an ostensibly alternative basis for recognizing a defense of insanity understood as a lack of moral capacity: whether a mental disease or defect leaves a defendant unable to understand that his action is wrong.

When the Arizona Legislature first codified an insanity rule, it adopted the full *M'Naghten* statement (subject to modifications in details that do not matter here):

"A person is not responsible for criminal conduct if at the time of such conduct the person was suffering from such a mental disease or defect as not to know the nature and quality of the act or, if such person did know, that such person did not know that what he was doing was wrong." Ariz. Rev. Stat. Ann. §13–502 (West 1978).[5]

In 1993, the legislature dropped the cognitive incapacity part, leaving only moral incapacity as the nub of the stated definition. See 1993 Ariz. Sess. Laws ch. 256, §§2–3.[6] Under current Arizona law, a defendant will not be adjudged insane unless he demonstrates that "at the time of the commission of the criminal act [he] was afflicted with a mental disease or defect of such severity that [he] did not know the criminal act was wrong," Ariz. Rev. Stat. Ann. §13–502(A) (West 2001).

A

Clark challenges the 1993 amendment excising the express reference to the cognitive incapacity element. He insists that the side-by-side *M'Naghten* test represents the minimum that a government must provide in recognizing an alternative to criminal responsibility on grounds of mental illness or defect, and he argues that elimination of

_____

[5] This statutory standard followed the Arizona Supreme Court's declaration that Arizona has "uniformly adhered" to the two-part *M'Naghten* standard. *State* v. *Schantz*, 98 Ariz. 200, 206, 403 P. 2d 521, 525 (1965) (citing cases), cert. denied, 382 U. S. 1015 (1966).

[6] This change was accompanied by others, principally an enumeration of mental states excluded from the category of "mental disease or defect," such as voluntary intoxication and other conditions, and a change of the insanity verdict from "not responsible for criminal conduct" by reason of insanity to "guilty except insane." See 1993 Ariz. Sess. Laws ch. 256, §§2–3. The 1993 amendments were prompted, at least in part, by an acquittal by reason of insanity in a murder case. See Note, Arizona's Insane Response to Insanity, 40 Ariz. L. Rev. 287, 290 (1998).

the *M'Naghten* reference to nature and quality "'offends
[a] principle of justice so rooted in the traditions and
conscience of our people as to be ranked as fundamental,'"
*Patterson* v. *New York,* 432 U. S. 197, 202 (1977) (quoting
*Speiser* v. *Randall,* 357 U. S. 513, 523 (1958)); see also
*Leland* v. *Oregon,* 343 U. S. 790, 798 (1952).

The claim entails no light burden, see *Montana* v. *Egel-
hoff,* 518 U. S. 37, 43 (1996) (plurality opinion), and Clark
does not carry it. History shows no deference to
*M'Naghten* that could elevate its formula to the level of
fundamental principle, so as to limit the traditional recog-
nition of a State's capacity to define crimes and defenses,
see *Patterson*, *supra*, at 210; see also *Foucha* v. *Louisiana,*
504 U. S. 71, 96 (1992) (KENNEDY, J., dissenting).

Even a cursory examination of the traditional Anglo-
American approaches to insanity reveals significant dif-
ferences among them, with four traditional strains vari-
ously combined to yield a diversity of American standards.
The main variants are the cognitive incapacity, the moral
incapacity, the volitional incapacity, and the product-of-
mental-illness tests.[7] The first two emanate from the
alternatives stated in the *M'Naghten* rule. The volitional
incapacity or irresistible-impulse test, which surfaced over
two centuries ago (first in England,[8] then in this country[9]),
asks whether a person was so lacking in volition due to a

———————

[7] "Capacity" is understood to mean the ability to form a certain state
of mind or motive, understand or evaluate one's actions, or control
them.

[8] See *Queen* v. *Oxford*, 9 Car. & P. 525, 546, 173 Eng. Rep. 941, 950
(1840) ("If some controlling disease was, in truth, the acting power
within [the defendant] which he could not resist, then he will not be
responsible"); *Hadfield's Case*, 27 How. St. Tr. 1281, 1314–1315, 1354–
1355 (K. B. 1800). But cf. *Queen* v. *Burton*, 3 F. & F. 772, 780, 176 Eng.
Rep. 354, 357 (1863) (rejecting the irresistible-impulse test as "a most
dangerous doctrine").

[9] *E.g.*, *Parsons* v. *State*, 81 Ala. 577, 2 So. 854 (1887); *State* v. *Thomp-
son*, Wright's Ohio Rep. 617 (1834).

mental defect or illness that he could not have controlled his actions. And the product-of-mental-illness test was used as early as 1870,[10] and simply asks whether a person's action was a product of a mental disease or defect.[11] Seventeen States and the Federal Government have adopted a recognizable version of the *M'Naghten* test with both its cognitive incapacity and moral incapacity components.[12] One State has adopted only *M'Naghten*'s cogni-

————————

[10] *State* v. *Jones*, 50 N. H. 369 (1871); *State* v. *Pike*, 49 N. H. 399 (1870).

[11] This distillation of the Anglo-American insanity standards into combinations of four building blocks should not be read to signify that no other components contribute to these insanity standards or that there are no material distinctions between jurisdictions testing insanity with the same building blocks. For example, the jurisdictions limit, in varying degrees, which sorts of mental illness or defect can give rise to a successful insanity defense. Compare, *e.g.*, Ariz. Rev. Stat. Ann. §13–502(A) (West 2001) (excluding from definition of "mental disease or defect" acute voluntary intoxication, withdrawal from alcohol or drugs, character defects, psychosexual disorders, and impulse control disorders) with, *e.g.*, Ind. Code §35–41–3–6(b) (West 2004) (excluding from definition of "mental disease or defect" "abnormality manifested only by repeated unlawful or antisocial conduct"). We need not compare the standards under a finer lens because our coarser analysis shows that the standards vary significantly.

[12] See 18 U. S. C. §17; Ala. Code §13A–3–1 (1994); Cal. Penal Code Ann. §25 (West 1999); Colo. Rev. Stat. §16–8–101.5 (2005); Fla. Stat. §775.027 (2003); Iowa Code §701.4 (2005); Minn. Stat. §611.026 (2004); *Stevens* v. *State*, 806 So. 2d 1031, 1050–1051 (Miss. 2001); Mo. Rev. Stat. §562.086 (2000); *State* v. *Harms*, 263 Neb. 814, 836–837, 643 N. W. 2d 359, 378–379 (2002); Nev. Rev. Stat. §194.010 (2003); *Finger* v. *State*, 117 Nev. 548, 553–577, 27 P. 3d 66, 70–85 (2001); N. J. Stat. Ann. §2C:4–1 (West 2005); N. Y. Penal Law Ann. §40.15 (West 2004); *State* v. *Thompson*, 328 N. C. 477, 485–486, 402 S. E. 2d 386, 390 (1991); *Burrows* v. *State*, 640 P. 2d 533, 540–541 (Okla. Crim. App. 1982) (interpreting statutory language excusing from criminal responsibility mentally ill defendants when "at the time of committing the act charged against them they were incapable of knowing its wrongfulness," Okla. Stat., Tit. 21, §152(4) (West 2001), to mean the two-part *M'Naghten* test); 18 Pa. Cons. Stat. §315 (2002); Tenn. Code Ann. §39–11–501 (2002); Wash. Rev. Code §9A.12.010 (2004). North Dakota has

tive incapacity test,[13] and 10 (including Arizona) have adopted the moral incapacity test alone.[14] Fourteen jurisdictions, inspired by the Model Penal Code,[15] have in place an amalgam of the volitional incapacity test and some variant of the moral incapacity test, satisfaction of either (generally by showing a defendant's substantial lack of capacity) being enough to excuse.[16] Three States combine a full *M'Naghten* test with a volitional incapacity formula.[17] And New Hampshire alone stands by the product-

————————

a unique test, which appears to be a modified version of *M'Naghten*, asking whether a defendant "lacks substantial capacity to comprehend the harmful nature or consequences of the conduct, or the conduct is the result of a loss or serious distortion of the individual's capacity to recognize reality," N. D. Cent. Code Ann. §12.1–04.1–01(1)(a) (Lexis 1997), when "[i]t is an essential element of the crime charged that the individual act willfully," §12.1–04.1–01(1)(b).

[13] Alaska Stat. §12.47.010 (2004).

[14] Ariz. Rev. Stat. Ann. §13–502 (West 2001); Del. Code Ann., Tit. 11, §401 (1995); Ind. Code §35–41–3–6 (West 2004); Ill. Comp. Stat., ch. 720, §5/6-2 (West 2004); La. Stat. Ann. §14:14 (West 1997); Me. Rev. Stat. Ann., Tit. 17–A, §39 (2006); Ohio Rev. Code Ann. §2901.01(A)(14) (Lexis 2006); S. C. Code Ann. §17–24–10 (2003); S. D. Codified Laws §22–1–2(20) (2005 Supp. Pamphlet); Tex. Penal Code Ann. §8.01 (West 2003).

[15] ALI, Model Penal Code §4.01(1) (Proposed Official Draft 1962) ("A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of the law").

[16] Ark. Code Ann. §5–2–312 (2006); Conn. Gen. Stat. §53a–13 (2005); *Malede* v. *United States*, 767 A. 2d 267, 269 (D. C. 2001); Ga. Code Ann. §§16–3–2, 16–3–3 (2003); Haw. Rev. Stat. §704–400 (1993); Ky. Rev. Stat. Ann. §504.020 (West 2003); Md. Crim. Proc. Code Ann. §3–109 (Lexis 2001); *Commonwealth* v. *McLaughlin*, 431 Mass. 506, 508, 729 N. E. 2d 252, 255 (2000); Ore. Rev. Stat. §161.295 (2005); *State* v. *Martinez*, 651 A. 2d 1189, 1193 (R. I. 1994); Vt. Stat. Ann., Tit. 13, §4801 (1998); *State* v. *Lockhart*, 208 W. Va. 622, 630, 542 S. E. 2d 443, 451 (2000); Wis. Stat. §971.15 (2003–2004); Wyo. Stat. Ann. §7–11–304 (2005).

[17] Mich. Comp. Laws Ann. §768.21a (West 2000); *State* v. *Hartley*, 90 N. M. 488, 490–491, 565 P. 2d 658, 660–661 (1977); *Bennett* v. *Com-*

of-mental-illness test.[18]    The alternatives are multiplied
further by variations in the prescribed insanity verdict: a
significant number of these jurisdictions supplement the
traditional "not guilty by reason of insanity" verdict with
an alternative of "guilty but mentally ill."[19]    Finally, four
States have no affirmative insanity defense,[20] though one
provides for a "guilty and mentally ill" verdict.[21]    These
four, like a number of others that recognize an affirmative
insanity defense, allow consideration of evidence of mental
illness directly on the element of *mens rea* defining the
offense.[22]

With this varied background, it is clear that no particu-
lar formulation has evolved into a baseline for due process,
and that the insanity rule, like the conceptualization of
criminal offenses, is substantially open to state choice.
Indeed, the legitimacy of such choice is the more obvious
when one considers the interplay of legal concepts of men-
tal illness or deficiency required for an insanity defense,

—————————

*monwealth*, 29 Va. App. 261, 277, 511 S. E. 2d 439, 446–447 (1999).
    [18] *State* v. *Plante*, 134 N. H. 456, 461, 594 A. 2d 1279, 1283 (1991).
    [19] See, *e.g.*, Alaska Stat. §§12.47.020(c), 12.47.030 (2004); Del. Code
Ann., Tit. 11, §401 (1995); Ga. Code Ann. §17–7–131 (2004); Ill. Comp.
Stat., ch. 720, §5/6–2 (West 2004); Ind. Code §§35–35–2–1, 35–36–1–1,
35–36–2–3 (West 2004); Ky. Rev. Stat. Ann. §504.130 (West 2003);
Mich. Comp. Laws Ann. §768.36 (West Supp. 2006); N. M. Stat. Ann.
§31–9–3 (2000); 18 Pa. Cons. Stat. §314 (2002); S. C. Code Ann. §17–
24–20 (2003); S. D. Codified Laws §23A–26–14 (2004).    Usually, a
defendant found "guilty but mentally ill" will receive mental-health
treatment until his mental health has rebounded, at which point he
must serve the remainder of his imposed sentence.  See, *e.g.*, Alaska
Stat. §12.47.050 (2004).
    [20] Idaho Code §18–207 (Lexis 2004); Kan. Stat. Ann. §22–3220 (1995);
Mont. Code Ann. §§46–14–102, 46–14–311 (2005); Utah Code Ann. §76–
2–305 (Lexis 2003).  We have never held that the Constitution man-
dates an insanity defense, nor have we held that the Constitution does
not so require.  This case does not call upon us to decide the matter.
    [21] §§77–16a–101, 77–16a–103, 77–16a–104 (Lexis 2003).
    [22] See statutes cited in n. 20, *supra*.

with the medical concepts of mental abnormality that influence the expert opinion testimony by psychologists and psychiatrists commonly introduced to support or contest insanity claims. For medical definitions devised to justify treatment, like legal ones devised to excuse from conventional criminal responsibility, are subject to flux and disagreement. See *infra*, at 31–33; cf. *Leland,* 343 U. S., at 800–801 (no due process violation for adopting the *M'Naghten* standard rather than the irresistible-impulse test because scientific knowledge does not require otherwise and choice of test is a matter of policy). There being such fodder for reasonable debate about what the cognate legal and medical tests should be, due process imposes no single canonical formulation of legal insanity.

B

Nor does Arizona's abbreviation of the *M'Naghten* statement raise a proper claim that some constitutional minimum has been shortchanged. Clark's argument of course assumes that Arizona's former statement of the *M'Naghten* rule, with its express alternative of cognitive incapacity, was constitutionally adequate (as we agree). That being so, the abbreviated rule is no less so, for cognitive incapacity is relevant under that statement, just as it was under the more extended formulation, and evidence going to cognitive incapacity has the same significance under the short form as it had under the long.

Though Clark is correct that the application of the moral incapacity test (telling right from wrong) does not necessarily require evaluation of a defendant's cognitive capacity to appreciate the nature and quality of the acts charged against him, see Brief for Petitioner 46–47, his argument fails to recognize that cognitive incapacity is itself enough to demonstrate moral incapacity. Cognitive incapacity, in other words, is a sufficient condition for establishing a defense of insanity, albeit not a necessary

one. As a defendant can therefore make out moral inca-
pacity by demonstrating cognitive incapacity, evidence
bearing on whether the defendant knew the nature and
quality of his actions is both relevant and admissible. In
practical terms, if a defendant did not know what he was
doing when he acted, he could not have known that he was
performing the wrongful act charged as a crime.[23] Indeed,
when the two-part rule was still in effect, the Supreme
Court of Arizona held that a jury instruction on insanity
containing the moral incapacity part but not a full recita-
tion of the cognitive incapacity part was fine, as the cogni-
tive incapacity part might be "'treated as adding nothing
to the requirement that the accused know his act was
wrong.'" *State* v. *Chavez*, 143 Ariz. 238, 239, 693 P. 2d
893, 894 (1984) (quoting A. Goldstein, The Insanity De-
fense 50 (1967)).

The Court of Appeals of Arizona acknowledged as much
in this case, too, see App. 350 ("It is difficult to imagine
that a defendant who did not appreciate the 'nature and
quality' of the act he committed would reasonably be able
to perceive that the act was 'wrong'"), and thus aligned
itself with the long-accepted understanding that the cogni-
tively incapacitated are a subset of the morally incapaci-
tated within the meaning of the standard *M'Naghten* rule,
see, *e.g.*, Goldstein, *supra*, at 51 ("In those situations
where the accused does not know the nature and quality of
his act, in the broad sense, he will not know that it was
wrong, no matter what construction 'wrong' is given"); 1

―――――――――

[23]He might, of course, have thought delusively he was doing some-
thing just as wrongful as the act charged against him, but this is not
the test: he must have understood that he was committing the act
charged and that it was wrongful, see Ariz. Rev. Stat. Ann. §13–502(A)
(West 2001) ("A person may be found guilty except insane if at the time
of the commission of the criminal act the person was afflicted with a
mental disease or defect of such severity that the person did not know
the criminal act was wrong").

W. LaFave, Substantive Criminal Law §7.2(b)(3), p. 536
(2d ed. 2003) ("Many courts feel that knowledge of 'the
nature and quality of the act' is the mere equivalent of the
ability to know that the act was wrong" (citing cases)); *id.*,
§7.2(b)(4), at 537 ("If the defendant does not know the
nature and quality of his act, then quite obviously he does
not know that his act is 'wrong,' and this is true without
regard to the interpretation given to the word 'wrong'"); cf.
1 R. Gerber, Criminal Law of Arizona 502–7, n. 1 (2d ed.
1993).[24]

  Clark, indeed, adopted this very analysis himself in the

———————

  [24] We think this logic holds true in the face of the usual rule of statu-
tory construction of "'"giv[ing] effect, if possible, to every clause and
word of a statute,"'" *Duncan* v. *Walker,* 533 U. S. 167, 174 (2001) (quot-
ing *United States* v. *Menasche,* 348 U. S. 528, 538–539 (1955)); see also 2
J. Sutherland, Statutes and Statutory Construction §4705 (3d ed. 1943).
Insanity standards are formulated to guide the factfinder to determine the
blameworthiness of a mentally ill defendant. See, *e.g.*, *Jones* v. *United
States,* 463 U. S. 354, 373, n. 4 (1983) (Brennan, J., dissenting). The
*M'Naghten* test is a sequential test, first asking the factfinder to conduct
the easier enquiry whether a defendant knew the nature and quality of
his actions. If not, the defendant is to be considered insane and there is no
need to pass to the harder and broader enquiry whether the defendant
knew his actions were wrong. And, because, owing to this sequence, the
factfinder is to ask whether a defendant lacks moral capacity only when
he possesses cognitive capacity, the only defendants who will be found to
lack moral capacity are those possessing cognitive capacity. Cf. 2 C.
Torcia, Wharton's Criminal Law §101 (15th ed. 1994). Though, before
1993, Arizona had in place the full *M'Naghten* test with this sequential
enquiry, see, *e.g.*, *Schantz*, 98 Ariz., at 207, 403 P. 2d, at 525, it would
appear that the legislature eliminated the cognitive capacity part not to
change the meaning of the insanity standard but to implement its judg-
ment that a streamlined standard with only the moral capacity part
would be easier for the jury to apply, see Arizona House of Representative
Judiciary Committee Notes 3 (Mar. 18, 1993); 1 R. Gerber, Criminal Law
of Arizona 502–6, 502–11 (2d ed. 1993 and Supp. 2000). This is corrobo-
rated by the State's choice for many years against revising the applicable
recommended jury instruction (enumerating the complete *M'Naghten* test)
in order to match the amended statutory standard. See 1 Gerber, *supra*,
at 502–6.

trial court: "[I]f [Clark] did not know he was shooting at a police officer, or believed he had to shoot or be shot, even though his belief was not based in reality, this would establish that he did not know what he was doing was wrong." Record, Doc. 374, at 1. The trial court apparently agreed, for the judge admitted Clark's evidence of cognitive incapacity for consideration under the State's moral incapacity formulation. And Clark can point to no evidence bearing on insanity that was excluded. His psychiatric expert and a number of lay witnesses testified to his delusions, and this evidence tended to support a description of Clark as lacking the capacity to understand that the police officer was a human being. There is no doubt that the trial judge considered the evidence as going to an issue of cognitive capacity, for in finding insanity not proven he said that Clark's mental illness "did not . . . distort his perception of reality so severely that he did not know his actions were wrong," App. 334.

We are satisfied that neither in theory nor in practice did Arizona's 1993 abridgment of the insanity formulation deprive Clark of due process.

## III

Clark's second claim of a due process violation challenges the rule adopted by the Supreme Court of Arizona in *State* v. *Mott*, 187 Ariz. 536, 931 P. 2d 1046 (en banc), cert. denied, 520 U. S. 1234 (1997). This case ruled on the admissibility of testimony from a psychologist offered to show that the defendant suffered from battered women's syndrome and therefore lacked the capacity to form the *mens rea* of the crime charged against her. The opinion variously referred to the testimony in issue as "psychological testimony," 187 Ariz., at 541, 931 P. 2d, at 1051, and "expert testimony," *ibid.*, and implicitly equated it with "expert psychiatric evidence," *id.*, at 540, 931 P. 2d, at 1050 (internal quotation marks omitted), and "psychiatric

testimony," *id.*, at 541, 931 P. 2d, at 1051.[25]    The state
court held that testimony of a professional psychologist or
psychiatrist about a defendant's mental incapacity owing
to mental disease or defect was admissible, and could be
considered, only for its bearing on an insanity defense;
such evidence could not be considered on the element of
*mens rea*, that is, what the State must show about a de-
fendant's mental state (such as intent or understanding)
when he performed the act charged against him.  See *id.*,
at 541, 544, 931 P. 2d, at 1051, 1054.[26]

                              A

   Understanding Clark's claim requires attention to the
categories of evidence with a potential bearing on *mens
rea*.  First, there is "observation evidence" in the everyday
sense, testimony from those who observed what Clark did
and heard what he said; this category would also include
testimony that an expert witness might give about Clark's
tendency to think in a certain way and his behavioral
characteristics.  This evidence may support a professional
diagnosis of mental disease and in any event is the kind of
evidence that can be relevant to show what in fact was on
Clark's mind when he fired the gun.  Observation evidence
in the record covers Clark's behavior at home and with
friends, his expressions of belief around the time of the
killing that "aliens" were inhabiting the bodies of local
people (including government agents),[27] his driving around

———————————

   [25] We thus think the dissent reads *Mott* too broadly.  See *post*, at 6–7
(opinion of KENNEDY, J.) (no distinction between observation and
mental-disease testimony, see *infra*, at 16–17, or lay and expert).

   [26] The more natural reading of *Mott* suggests to us that this evidence
cannot be considered as to *mens rea* even if the defendant establishes
his insanity, though one might read *Mott* otherwise.

   [27] Clark's parents testified that, in the months before the shooting
and even days beforehand, Clark called them "aliens" and thought that
"aliens" were out to get him.  See, *e.g.*, Tr. of Bench Trial in No. CR
2000–538, pp. 110–112, 136, 226–228 (Aug. 20, 2003).  One night before

the neighborhood before the police arrived, and so on. Contrary to the dissent's characterization, see *post*, at 2 (opinion of KENNEDY, J.), observation evidence can be presented by either lay or expert witnesses.

Second, there is "mental-disease evidence" in the form of opinion testimony that Clark suffered from a mental disease with features described by the witness. As was true here, this evidence characteristically but not always[28] comes from professional psychologists or psychiatrists who testify as expert witnesses and base their opinions in part on examination of a defendant, usually conducted after the events in question. The thrust of this evidence was that, based on factual reports, professional observations, and tests, Clark was psychotic at the time in question, with a condition that fell within the category of schizophrenia.

Third, there is evidence we will refer to as "capacity evidence" about a defendant's capacity for cognition and moral judgment (and ultimately also his capacity to form *mens rea*). This, too, is opinion evidence. Here, as it usually does,[29] this testimony came from the same experts and concentrated on those specific details of the mental condition that make the difference between sanity and insanity under the Arizona definition.[30] In their respec-

_____

the shooting, according to Clark's mother, Clark repeatedly viewed a popular film characterized by her as telling a story about "aliens" masquerading as government agents, a story Clark insisted was real despite his mother's protestations to the contrary. See *id.*, at 59–60 (Aug. 21, 2003). And two months after the shooting, Clark purportedly told his parents that his hometown, Flagstaff, was inhabited principally by "aliens," who had to be stopped, and that the only way to stop them was with bullets. See, *e.g.*, *id.*, at 131–132 (Aug. 20, 2003); *id.*, at 24–25 (Aug. 21, 2003).

[28] This is contrary to the dissent's understanding. See *post*, at 2–3 (opinion of KENNEDY, J.).

[29] In conflict with the dissent's characterization, see *post*, at 2 (opinion of KENNEDY, J.), it does not always, however, come from experts.

[30] Arizona permits capacity evidence, see, *e.g.*, *State* v. *Sanchez*, 117

tive testimony on these details the experts disagreed: the defense expert gave his opinion that the symptoms or effects of the disease in Clark's case included inability to appreciate the nature of his action and to tell that it was wrong, whereas the State's psychiatrist was of the view that Clark was a schizophrenic who was still sufficiently able to appreciate the reality of shooting the officer and to know that it was wrong to do that.[31]

A caveat about these categories is in order. They attempt to identify different kinds of testimony offered in this case in terms of explicit and implicit distinctions made in *Mott*. What we can say about these categories goes to their cores, however, not their margins. Exact

—————

Ariz. 369, 373, 573 P. 2d 60, 64 (1977); see also Ariz. Rule Evid. 704 (2006) (allowing otherwise admissible evidence on testimony "embrac[ing] an ultimate issue to be decided by the trier of fact"), though not every jurisdiction permits such evidence on the ultimate issue of insanity. See, *e.g.*, Fed. Rule Evid. 704(b) ("No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or a defense thereto. Such ultimate issues are matters for the trier of fact alone"); *United States* v. *Dixon*, 185 F. 3d 393, 400 (CA5 1999) (in the face of mental-disease evidence, Rule 704(b) prohibits an expert "from testifying that [the mental-disease evidence] does or does not prevent the defendant from appreciating the wrongfulness of his actions").

[31] Arizona permits evidence bearing on insanity to be presented by either lay or expert witnesses. See *State* v. *Bay*, 150 Ariz. 112, 116, 722 P. 2d 280, 284 (1986). According to *Bay*, "[f]oundationally, a lay witness must have had an opportunity to observe the past conduct and history of a defendant; the fact that he is a lay witness goes not to the admissibility of the testimony but rather to its weight." *Ibid.* (citation omitted); see also *State* v. *Hughes*, 193 Ariz. 72, 83, 969 P. 2d 1184, 1195 (1998). In fact, a defendant can theoretically establish insanity solely via lay testimony. See *Bay*, 150 Ariz., at 116, 722 P. 2d, at 284. But cf. *State* v. *McMurtrey*, 136 Ariz. 93, 100, 664 P. 2d 637, 644 (1983) ("[I]t is difficult to imagine how a defendant could place his or her sanity in issue . . . without expert testimony as to the defendant's state of mind at the time of the crime").

limits have thus not been worked out in any Arizona law that has come to our attention, and in this case, neither the courts in their rulings nor counsel in objections invoked or required precision in applying the *Mott* rule's evidentiary treatment, as we explain below. Necessarily, then, our own decision can address only core issues, leaving for other cases any due process claims that may be raised about the treatment of evidence whose categorization is subject to dispute.

B

It is clear that *Mott* itself imposed no restriction on considering evidence of the first sort, the observation evidence. We read the *Mott* restriction to apply, rather, to evidence addressing the two issues in testimony that characteristically comes only from psychologists or psychiatrists qualified to give opinions as expert witnesses: mental-disease evidence (whether at the time of the crime a defendant suffered from a mental disease or defect, such as schizophrenia) and capacity evidence (whether the disease or defect left him incapable of performing or experiencing a mental process defined as necessary for sanity such as appreciating the nature and quality of his act and knowing that it was wrong).

*Mott* was careful to distinguish this kind of opinion evidence from observation evidence generally and even from observation evidence that an expert witness might offer, such as descriptions of a defendant's tendency to think in a certain way or his behavioral characteristics; the Arizona court made it clear that this sort of testimony was perfectly admissible to rebut the prosecution's evidence of *mens rea*, 187 Ariz., at 544, 931 P. 2d, at 1054. Thus, only opinion testimony going to mental defect or disease, and its effect on the cognitive or moral capacities on which sanity depends under the Arizona rule, is restricted.

In this case, the trial court seems to have applied the
*Mott* restriction to all evidence offered by Clark for the
purpose of showing what he called his inability to form the
required *mens rea*, see, *e.g.*, Record, Doc. 406, pp. 7–10,
(that is, an intent to kill a police officer on duty, or an
understanding that he was engaging in the act of killing
such an officer, see Ariz. Rev. Stat. Ann. §13–1105(A)(3)
(West Supp. 2005)). Thus, the trial court's restriction may
have covered not only mental-disease and capacity evi-
dence as just defined, but also observation evidence of-
fered by lay (and expert) witnesses who described Clark's
unusual behavior. Clark's objection to the application of
the *Mott* rule does not, however, turn on the distinction
between lay and expert witnesses or the kinds of testi-
mony they were competent to present.[32]

C

There is some, albeit limited, disagreement between the
dissent and ourselves about the scope of the claim of error
properly before us. To start with matters of agreement, all
Members of the Court agree that Clark's general attack on
the *Mott* rule covers its application in confining considera-
tion of capacity evidence to the insanity defense.

In practical terms, our agreement on issues presented
extends to a second point. JUSTICE KENNEDY understands
that Clark raised an objection to confining mental-disease
evidence to the insanity issue. As he sees it, Clark in
effect claimed that in dealing with the issue of *mens rea*
the trial judge should have considered expert testimony on
what may characteristically go through the mind of a

————————
[32] With respect to "the limited factual issues the trial court held it
could consider under [Ariz. Rev. Stat. Ann. §]13–502 and *Mott*, defense
counsel made no additional 'offer of proof' at the conclusion of the case
but preserved [Clark's] legal contentions by asking the court to consider
all of the evidence presented in determining whether the state had
proved its case." Brief for Petitioner 10, n. 20 (citations omitted).

schizophrenic, when the judge considered what in fact was in Clark's mind at the time of the shooting. See *post*, at 3 (dissenting opinion) ("[T]he opinion that Clark had paranoid schizophrenia—an opinion shared by experts for both the prosecution and defense—bears on efforts to determine, as a factual matter, whether he knew he was killing a police officer"). He thus understands that defense counsel claimed a right to rebut the State's *mens rea* demonstration with testimony about how schizophrenics may hallucinate voices and other sounds, about their characteristic failure to distinguish the content of their imagination from what most people perceive as exterior reality, and so on. It is important to be clear that this supposed objection was not about dealing with testimony based on observation of Clark showing that he had auditory hallucinations when he was driving around, or failed in fact to appreciate objective reality when he shot; this objection went to use of testimony about schizophrenics, not about Clark in particular. While we might dispute how clearly Clark raised this objection, we have no doubt that the objection falls within a general challenge to the *Mott* rule; we understand that *Mott* is meant to confine to the insanity defense any consideration of characteristic behavior associated with mental disease, see 187 Ariz., at 544, 931 P. 2d, at 1054 (contrasting *State* v. *Christensen*, 129 Ariz. 32, 628 P. 2d 580 (1991), and *State* v. *Gonzales*, 140 Ariz. 349, 681 P. 2d 1368 (1984)). We will therefore assume for argument that Clark raised this claim, as we consider the due process challenge to the *Mott* rule.

   The point on which we disagree with the dissent, however, is this: did Clark apprise the Arizona courts that he believed the trial judge had erroneously limited the consideration of observation evidence, whether from lay witnesses like Clark's mother or (possibly) the expert witnesses who observed him? This sort of evidence was not covered by the *Mott* restriction, and confining it to the

insanity issue would have been an erroneous application
of *Mott* as a matter of Arizona law. For the following
reasons we think no such objection was made in a way the
Arizona courts could have understood it, and that no such
issue is before us now. We think the only issue properly
before us is the challenge to *Mott* on due process grounds,
comprising objections to limits on the use of mental-
disease and capacity evidence.

It is clear that the trial judge intended to apply *Mott:*

> "[R]ecognizing that much of the evidence that [the de-
> fense is] going to be submitting, in fact all of it, as far
> as I know . . . that has to do with the insanity could
> also arguably be made along the lines of the Mott is-
> sue as to form and intent and his capacity for the in-
> tent. I'm going to let you go ahead and get all that
> stuff in because it goes to the insanity issue and be-
> cause we're not in front of a jury. At the end, I'll let
> you make an offer of proof as to the intent, the Mott
> issues, but I still think the supreme court decision is
> the law of the land in this state." App. 9.

At no point did the trial judge specify any particular
evidence that he refused to consider on the *mens rea* issue.
Nor did defense counsel specify any observation or other
particular evidence that he claimed was admissible but
wrongly excluded on the issue of *mens rea*, so as to pro-
duce a clearer ruling on what evidence was being re-
stricted on the authority of *Mott* and what was not. He
made no "offer of proof" in the trial court;[33] and although

_____

[33] We do not agree with the State's argument that the failure to make
an offer of proof, see n. 4, *supra*, is a bar to pressing Clark's claim about
the admissibility of mental-illness or capacity evidence as to *mens rea*,
see Brief for Respondent 27–29, especially when the Arizona Court of
Appeals rejected Clark's argument on the merits rather than clearly on
this ground, see App. 351–353; see also *Michigan* v. *Long*, 463 U. S.
1032, 1042 (1983) ("[I]t is not clear from the opinion itself that the state

his brief in the Arizona Court of Appeals stated at one point that it was not inconsistent with *Mott* to consider nonexpert evidence indicating mental illness on the issue of *mens rea*, and argued that the trial judge had failed to do so, Appellant's Opening Brief in No. 1CA–CR–03–0851 etc. (Ariz. Ct. App.), pp. 48–49 (hereinafter Appellant's Opening Brief), he was no more specific than that, see, *e.g.*, *id.*, at 52 ("The Court's ruling in *Mott* and the trial court's refusal to consider whether as a result of suffering from paranoid schizophrenia [Clark] could not formulate the *mens rea* necessary for first degree murder violated his right to due process"). Similarly, we read the Arizona Court of Appeals to have done nothing more than rely on *Mott* to reject the claim that due process forbids restricting evidence bearing on "*[a]bility to [f]orm [m]ens [r]ea*," App. 351 (emphasis in original), (*i.e.*, mental-disease and capacity evidence) to the insanity determination. See *id.*, at 351–353.

This failure in the state courts to raise any clear claim about observation evidence, see Appellant's Opening Brief 46–52, is reflected in the material addressed to us, see Brief for Petitioner 13–32. In this Court both the question presented and the following statement of his position were couched in similarly worded general terms:

> "I. ERIC WAS DENIED DUE PROCESS WHEN THE TRIAL COURT REFUSED TO CONSIDER EVIDENCE OF HIS SEVERE MENTAL ILLNESS IN DETERMINING FACTUALLY WHETHER THE PROSECUTION PROVED THE MENTAL ELEMENTS OF THE CRIME CHARGED." *Id.*, at 13.

But as his counsel made certain beyond doubt in his reply brief,

———————

court relied upon an adequate and independent state ground and . . . it fairly appears that the state court rested its decision primarily on federal law").

> "Eric's Point I is and always has been an attack on the
> rule of *State* v. *Mott*, which both courts below held ap-
> plicable and binding. *Mott* announced a categorical
> 'rejection of the use of psychological testimony to chal-
> lenge the *mens rea* element of a crime,' and upheld
> this rule against federal due process challenge." Re-
> ply Brief for Petitioner 2 (citations omitted).

This explanation is supported by other statements in
Clark's briefs in both the State Court of Appeals and this
Court, replete with the consistently maintained claim that
it was error to limit evidence of mental illness and inca-
pacity to its bearing on the insanity defense, excluding it
from consideration on the element of *mens rea*. See, *e.g.*,
Appellant's Opening Brief 46, 47, 51; Brief for Petitioner
11, 13, 16, 20–23.

In sum, the trial court's ruling, with its uncertain edges,
may have restricted observation evidence admissible on
*mens rea* to the insanity defense alone, but we cannot be
sure.[34] But because a due process challenge to such a
restriction of observation evidence was, by our measure,
neither pressed nor passed upon in the Arizona Court of
Appeals, we do not consider it. See, *e.g.*, *Kentucky* v. *Stin-
cer,* 482 U. S. 730, 747, n. 22 (1987); *Illinois* v. *Gates,* 462
U. S. 213, 217–224 (1983). What we do know, and now

--------

[34]We therefore have no reason to believe that the courts of Arizona
would have failed to restrict their application of *Mott* to the professional
testimony the *Mott* opinion was stated to cover, if Clark's counsel had
specified any observation evidence he claimed to be generally admissi-
ble and relevant to *mens rea*. Nothing that we hold here is authority
for restricting a factfinder's consideration of observation evidence
indicating state of mind at the time of a criminal offense (conventional
*mens rea* evidence) as distinct from professional mental-disease or
capacity evidence going to ability to form a certain state of mind during
a period that includes the time of the offense charged. And, of course,
nothing held here prevents Clark from raising this discrete claim when
the case returns to the courts of Arizona, if consistent with the State's
procedural rules.

consider, is Clark's claim that *Mott* denied due process because it *"preclude[d] Eric from contending that . . . factual inferences"* of the "mental states which were necessary elements of the crime charged" *"should not be drawn* because the behavior was explainable, instead, as a manifestation of his chronic paranoid schizophrenia." Brief for Petitioner 13 (emphasis in original). We consider the claim, as Clark otherwise puts it, that "Arizona's prohibition of 'diminished capacity' evidence by criminal defendants violates" due process, *ibid.*

### D

Clark's argument that the *Mott* rule violates the Fourteenth Amendment guarantee of due process turns on the application of the presumption of innocence in criminal cases, the presumption of sanity, and the principle that a criminal defendant is entitled to present relevant and favorable evidence on an element of the offense charged against him.

### 1

The first presumption is that a defendant is innocent unless and until the government proves beyond a reasonable doubt each element of the offense charged, see *Patterson,* 432 U. S., at 210–211; *In re Winship,* 397 U. S. 358, 361–364 (1970), including the mental element or *mens rea.* Before the last century, the *mens rea* required to be proven for particular offenses was often described in general terms like "malice," see, *e.g., In re Eckart,* 166 U. S. 481 (1897); 4 W. Blackstone, Commentaries *21 ("[A]n unwarrantable act without a vicious will is no crime at all"), but the modern tendency has been toward more specific descriptions, as shown in the Arizona statute defining the murder charged against Clark: the State had to prove that in acting to kill the victim, Clark intended to kill a law enforcement officer on duty or knew that the victim was

such an officer on duty. See generally Gardner, The *Mens Rea* Enigma: Observations on the Role of Motive in the Criminal Law Past and Present, 1993 Utah L. Rev. 635. As applied to *mens rea* (and every other element), the force of the presumption of innocence is measured by the force of the showing needed to overcome it, which is proof beyond a reasonable doubt that a defendant's state of mind was in fact what the charge states. See *Winship*, *supra*, at 361–363.

2

The presumption of sanity is equally universal in some variety or other, being (at least) a presumption that a defendant has the capacity to form the *mens rea* necessary for a verdict of guilt and the consequent criminal responsibility. See *Leland*, 343 U. S., at 799; *Davis* v. *United States*, 160 U. S. 469, 486–487 (1895); *M'Naghten's Case*, 10 Cl. & Fin., at 210, 8 Eng. Rep., at 722; see generally 1 LaFave, Substantive Criminal Law §8.3(a), at 598–599, and n. 1. This presumption dispenses with a requirement on the government's part to include as an element of every criminal charge an allegation that the defendant had such a capacity.[35] The force of this presumption, like the presumption of innocence, is measured by the quantum of evidence necessary to overcome it; unlike the presumption of innocence, however, the force of the presumption of sanity varies across the many state and federal jurisdictions, and prior law has recognized considerable leeway on the part of the legislative branch in defining the presumption's strength through the kind of evidence and degree of persuasiveness necessary to overcome it, see *Fisher* v. *United States,* 328 U. S. 463, 466–476 (1946).[36]

---

[35] A legislature is nonetheless free to require affirmative proof of sanity by the way it describes a criminal offense, see *Dixon* v. *United States*, *ante*, at ___ (slip op., at 7–9).

[36] Although a desired evidentiary use is restricted, that is not equiva-

Opinion of the Court

There are two points where the sanity or capacity pre-
sumption may be placed in issue. First, a State may allow
a defendant to introduce (and a factfinder to consider)
evidence of mental disease or incapacity for the bearing it
can have on the government's burden to show *mens rea*.
See, *e.g.*, *State* v. *Perez*, 882 A. 2d 574, 584 (R. I. 2005).[37]
In such States the evidence showing incapacity to form the
guilty state of mind, for example, qualifies the probative
force of other evidence, which considered alone indicates
that the defendant actually formed the guilty state of
mind. If it is shown that a defendant with mental disease
thinks all blond people are robots, he could not have in-
tended to kill a person when he shot a man with blond
hair, even though he seemed to act like a man shooting
another man.[38] In jurisdictions that allow mental-disease
and capacity evidence to be considered on par with any

_____

lent to a *Sandstrom* presumption. See *Sandstrom* v. *Montana,* 442 U. S.
510, 514–524 (1979) (due process forbids use of presumption that relieves
the prosecution of burden of proving mental state by inference of intent
from an act).

[37] In fact, Oregon had this scheme in place when we decided *Leland* v.
*Oregon*, 343 U. S. 790, 794–796 (1952). We do not, however, read any
part of *Leland* to require as a matter of due process that evidence of
incapacity be considered to rebut the *mens rea* element of a crime.

[38] We reject the State's argument that *mens rea* and insanity, as cur-
rently understood, are entirely distinguishable, so that mental-disease
and capacity evidence relevant to insanity is simply irrelevant to *mens
rea*. Not only does evidence accepted as showing insanity trump *mens
rea*, but evidence of behavior close to the time of the act charged may
indicate both the actual state of mind at that time and also an enduring
incapacity to form the criminal state of mind necessary to the offense
charged. See Brief for American Psychiatric Association et al. as *Amici
Curiae* 12–13; Arenella, The Diminished Capacity and Diminished
Responsibility Defenses: Two Children of a Doomed Marriage, 77
Colum. L. Rev. 827, 834–835 (1977); cf. *Powell* v. *Texas,* 392 U. S. 514,
535–536 (1968) (plurality opinion) (the "doctrines of *actus reus*, *mens rea*,
insanity, mistake, justification, and duress" are a "collection of interlock-
ing and overlapping concepts which the common law has utilized to assess
the moral accountability of an individual for his antisocial deeds").

other relevant evidence when deciding whether the prosecution has proven *mens rea* beyond a reasonable doubt, the evidence of mental disease or incapacity need only support what the factfinder regards as a reasonable doubt about the capacity to form (or the actual formation of) the *mens rea*, in order to require acquittal of the charge. Thus, in these States the strength of the presumption of sanity is no greater than the strength of the evidence of abnormal mental state that the factfinder thinks is enough to raise a reasonable doubt.

The second point where the force of the presumption of sanity may be tested is in the consideration of a defense of insanity raised by a defendant. Insanity rules like *M'Naghten* and the variants discussed in Part II, *supra*, are attempts to define, or at least to indicate, the kinds of mental differences that overcome the presumption of sanity or capacity and therefore excuse a defendant from customary criminal responsibility, see *Jones,* 463 U. S., at 373, n. 4 (Brennan, J., dissenting); D. Hermann, The Insanity Defense: Philosophical, Historical and Legal Perspectives 4 (1983) ("A central significance of the insanity defense . . . is the separation of nonblameworthy from blameworthy offenders"), even if the prosecution has otherwise overcome the presumption of innocence by convincing the factfinder of all the elements charged beyond a reasonable doubt. The burden that must be carried by a defendant who raises the insanity issue, again, defines the strength of the sanity presumption. A State may provide, for example, that whenever the defendant raises a claim of insanity by some quantum of credible evidence, the presumption disappears and the government must prove sanity to a specified degree of certainty (whether beyond reasonable doubt or something less). See, *e.g.*, *Commonwealth* v. *Keita,* 429 Mass. 843, 846, 712 N. E. 2d 65, 68 (1999). Or a jurisdiction may place the burden of persuasion on a defendant to prove insanity as the appli-

cable law defines it, whether by a preponderance of the evidence or to some more convincing degree, see Ariz. Rev. Stat. Ann. §13–502(C) (West 2001); *Leland*, 343 U. S., at 798. In any case, the defendant's burden defines the presumption of sanity, whether that burden be to burst a bubble or to show something more.

3

The third principle implicated by Clark's argument is a defendant's right as a matter of simple due process to present evidence favorable to himself on an element that must be proven to convict him.[39] As already noted, evidence tending to show that a defendant suffers from mental disease and lacks capacity to form *mens rea* is relevant to rebut evidence that he did in fact form the required *mens rea* at the time in question; this is the reason that Clark claims a right to require the factfinder in this case to consider testimony about his mental illness and his incapacity directly, when weighing the persuasiveness of other evidence tending to show *mens rea*, which the prosecution has the burden to prove.

As Clark recognizes, however, the right to introduce relevant evidence can be curtailed if there is a good reason for doing that. "While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or poten-

---

[39] Clark's argument assumes that Arizona's rule is a rule of evidence, rather than a redefinition of *mens rea*, see *Montana* v. *Egelhoff,* 518 U. S. 37, 58–59 (1996) (GINSBURG, J., concurring in judgment); *id.*, at 71 (O'Connor, J., dissenting). We have no reason to view the rule otherwise, and on this assumption, it does not violate due process, see *infra*, at 31–39.

tial to mislead the jury." *Holmes* v. *South Carolina,* 547 U. S. ___, ___ (2006) (slip op., at 6); see *Crane* v. *Kentucky,* 476 U. S. 683, 689–690 (1986) (permitting exclusion of evidence that "poses an undue risk of 'harassment, prejudice, [or] confusion of the issues'" (quoting *Delaware* v. *Van Arsdall,* 475 U. S. 673, 679 (1986))); see also *Egelhoff,* 518 U. S. 37; *Chambers* v. *Mississippi,* 410 U. S. 284, 302 (1973). And if evidence may be kept out entirely, its consideration may be subject to limitation, which Arizona claims the power to impose here. State law says that evidence of mental disease and incapacity may be introduced and considered, and if sufficiently forceful to satisfy the defendant's burden of proof under the insanity rule it will displace the presumption of sanity and excuse from criminal responsibility. But mental-disease and capacity evidence may be considered only for its bearing on the insanity defense, and it will avail a defendant only if it is persuasive enough to satisfy the defendant's burden as defined by the terms of that defense. The mental-disease and capacity evidence is thus being channeled or restricted to one issue and given effect only if the defendant carries the burden to convince the factfinder of insanity; the evidence is not being excluded entirely, and the question is whether reasons for requiring it to be channeled and restricted are good enough to satisfy the standard of fundamental fairness that due process requires. We think they are.

E

1

The first reason supporting the *Mott* rule is Arizona's authority to define its presumption of sanity (or capacity or responsibility) by choosing an insanity definition, as discussed in Part II, *supra*, and by placing the burden of persuasion on defendants who claim incapacity as an excuse from customary criminal responsibility. No one, certainly not Clark here, denies that a State may place a

burden of persuasion on a defendant claiming insanity, see *Leland, supra*, at 797–799 (permitting a State, consistent with due process, to require the defendant to bear this burden). And Clark presses no objection to Arizona's decision to require persuasion to a clear and convincing degree before the presumption of sanity and normal responsibility is overcome. See Brief for Petitioner 18, n. 25.

But if a State is to have this authority in practice as well as in theory, it must be able to deny a defendant the opportunity to displace the presumption of sanity more easily when addressing a different issue in the course of the criminal trial. Yet, as we have explained, just such an opportunity would be available if expert testimony of mental disease and incapacity could be considered for whatever a factfinder might think it was worth on the issue of *mens rea*.[40] As we mentioned, the presumption of sanity would then be only as strong as the evidence a factfinder would accept as enough to raise a reasonable doubt about *mens rea* for the crime charged*;* once reasonable doubt was found, acquittal would be required, and the standards established for the defense of insanity would go by the boards.

Now, a State is of course free to accept such a possibility in its law. After all, it is free to define the insanity defense by treating the presumption of sanity as a bursting bubble, whose disappearance shifts the burden to the prosecution to prove sanity whenever a defendant presents any credible evidence of mental disease or incapacity. In States with this kind of insanity rule, the legislature may well be willing to allow such evidence to be considered on the *mens rea* element for whatever the

———————

[40] Cf. *post*, at 3 (KENNEDY, J., dissenting) ("The psychiatrist's explanation of Clark's condition was essential to understanding how he processes sensory data and therefore to deciding what information was in his mind at the time of the shooting. Simply put, knowledge relies on cognition, and cognition can be affected by schizophrenia").

factfinder thinks it is worth.  What counts for due process, however, is simply that a State that wishes to avoid a second avenue for exploring capacity, less stringent for a defendant, has a good reason for confining the consideration of evidence of mental disease and incapacity to the insanity defense.

It is obvious that Arizona's *Mott* rule reflects such a choice.  The State Supreme Court pointed out that the State had declined to adopt a defense of diminished capacity (allowing a jury to decide when to excuse a defendant because of greater than normal difficulty in conforming to the law).[41]  The court reasoned that the State's choice would be undercut if evidence of incapacity could be considered for whatever a jury might think sufficient to raise a reasonable doubt about *mens rea*, even if it did not show insanity.  187 Ariz., at 541, 931 P. 2d, at 1051.  In other words, if a jury were free to decide how much evidence of mental disease and incapacity was enough to counter evidence of *mens rea* to the point of creating a reasonable doubt, that would in functional terms be analogous to allowing jurors to decide upon some degree of diminished capacity to obey the law, a degree set by them, that would

---

[41] Though the term "diminished capacity" has been given different meanings, see, *e.g.*, Morse, Undiminished Confusion in Diminished Capacity, 75 J. Crim. L. & C. 1 (1984) ("The diminished capacity doctrine allows a criminal defendant to introduce evidence of mental abnormality at trial either to negate a mental element of the crime charged, thereby exonerating the defendant of that charge, or to reduce the degree of crime for which the defendant may be convicted, even if the defendant's conduct satisfied all the formal elements of a higher offense"), California, a jurisdiction with which the concept has traditionally been associated, understood it to be simply a "'showing that the defendant's mental capacity was reduced by mental illness, mental defect or intoxication,'" *People* v. *Berry*, 18 Cal. 3d 509, 517, 556 P. 2d 777, 781 (1976) (in banc) (quoting *People* v. *Castillo*, 70 Cal. 2d 264, 270, 449 P. 2d 449, 452 (1969); emphasis deleted), abrogated by Cal. Penal Code Ann. §§25(a), 28(a)–(b), 29 (West 1999 and Supp. 2006).

prevail as a stand-alone defense.[42]

## 2

A State's insistence on preserving its chosen standard of legal insanity cannot be the sole reason for a rule like *Mott*, however, for it fails to answer an objection the dissent makes in this case. See *post*, at 10–18 (opinion of KENNEDY, J.). An insanity rule gives a defendant already found guilty the opportunity to excuse his conduct by showing he was insane when he acted, that is, that he did not have the mental capacity for conventional guilt and criminal responsibility. But, as the dissent argues, if the same evidence that affirmatively shows he was not guilty by reason of insanity (or "guilty except insane" under Arizona law, Ariz. Rev. Stat. Ann. §13–502(A) (West 2001)) also shows it was at least doubtful that he could form *mens rea*, then he should not be found guilty in the first place; it thus violates due process when the State impedes him from using mental-disease and capacity evidence directly to rebut the prosecution's evidence that he did form *mens rea*.

Are there, then, characteristics of mental-disease and capacity evidence giving rise to risks that may reasonably be hedged by channeling the consideration of such evidence to the insanity issue on which, in States like Ari-

-------------

[42] It is beyond question that Arizona may preclude such a defense, see *Fisher* v. *United States,* 328 U. S. 463, 466–476 (1946), and there is no doubt that the Arizona Legislature meant to do so, see Ariz. Rev. Stat. Ann. §13–502(A) (West 2001) ("Mental disease or defect does not include disorders that result from acute voluntary intoxication or withdrawal from alcohol or drugs, character defects, psychosexual disorders or impulse control disorders. Conditions that do not constitute legal insanity include but are not limited to momentary, temporary conditions arising from the pressure of the circumstances, moral decadence, depravity or passion growing out of anger, jealousy, revenge, hatred or other motives in a person who does not suffer from a mental disease or defect or an abnormality that is manifested only by criminal conduct").

zona, a defendant has the burden of persuasion?  We think
there are: in the controversial character of some categories
of mental disease, in the potential of mental-disease evi-
dence to mislead, and in the danger of according greater
certainty to capacity evidence than experts claim for it.

To begin with, the diagnosis may mask vigorous debate
within the profession about the very contours of the men-
tal disease itself.  See, *e.g.*, American Psychiatric Associa-
tion, Diagnostic and Statistical Manual of Mental Disor-
ders xxxiii (4th ed. text rev. 2000) (hereinafter DSM–IV–
TR) ("DSM–IV reflects a consensus about the classification
and diagnosis of mental disorders derived at the time of its
initial publication.  New knowledge generated by research
or clinical experience will undoubtedly lead to an in-
creased understanding of the disorders included in DSM–
IV, to the identification of new disorders, and to the re-
moval of some disorders in future classifications.  The text
and criteria sets included in DSM–IV will require recon-
sideration in light of evolving new information"); P.
Caplan, They Say You're Crazy: How the World's Most
Powerful Psychiatrists Decide Who's Normal (1995) (criti-
cism by former consultant to the DSM against some of the
DSM's categories).  And Members of this Court have pre-
viously recognized that the end of such debate is not im-
minent.  See *Jones,* 463 U. S., at 364–365, n. 13 ("'The only
certain thing that can be said about the present state of
knowledge and therapy regarding mental disease is that
science has not reached finality of judgment'" (quoting
*Greenwood* v. *United States,* 350 U. S. 366, 375 (1956)));
*Powell* v. *Texas,* 392 U. S. 514, 537 (1968) (plurality opinion)
("It is simply not yet the time to write into the Constitution
formulas cast in terms whose meaning, let alone relevance,
is not yet clear . . . to doctors").  Though we certainly do not
"condem[n mental-disease evidence] wholesale", Brief for
American Psychiatric Association et al. as *Amici Curiae*
15, the consequence of this professional ferment is a general

caution in treating psychological classifications as predicates for excusing otherwise criminal conduct.

Next, there is the potential of mental-disease evidence to mislead jurors (when they are the factfinders) through the power of this kind of evidence to suggest that a defendant suffering from a recognized mental disease lacks cognitive, moral, volitional, or other capacity, when that may not be a sound conclusion at all. Even when a category of mental disease is broadly accepted and the assignment of a defendant's behavior to that category is uncontroversial, the classification may suggest something very significant about a defendant's capacity, when in fact the classification tells us little or nothing about the ability of the defendant to form *mens rea* or to exercise the cognitive, moral, or volitional capacities that define legal sanity.[43] See DSM–IV–TR xxxii–xxxiii ("When the DSM–IV categories, criteria, and textual descriptions are employed for forensic purposes, there are significant risks that diagnostic information will be misused or misunderstood. These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis. In most situations, the clinical diagnosis of a DSM–IV mental disorder is not sufficient to establish the existence for legal purposes of . . . 'mental diseas[e]' or 'mental defect.' In determining whether an individual meets a specified legal standard (e.g., for . . . criminal responsibility . . .), additional information is usually required beyond that contained in the DSM–IV diagnosis"). The limits of the utility of a professional

————————

[43] Our observation about the impact of mental-disease evidence on understandings of capacity in no way undermines the assertion by the American Psychiatric Association, the American Psychological Association, and the American Academy of Psychiatry in this case that "[e]xpert evidence of mental disorders . . . is . . . relevant to the mental-state issues raised by *mens rea* requirements," Brief for American Psychiatric Association et al. as *Amici Curiae* 15.

disease diagnosis are evident in the dispute between the two testifying experts in this case; they agree that Clark was schizophrenic, but they come to opposite conclusions on whether the mental disease in his particular case left him bereft of cognitive or moral capacity. Evidence of mental disease, then, can easily mislead; it is very easy to slide from evidence that an individual with a professionally recognized mental disease is very different, into doubting that he has the capacity to form *mens rea*, whereas that doubt may not be justified. And of course, in the cases mentioned before, in which the categorization is doubtful or the category of mental disease is itself subject to controversy, the risks are even greater that opinions about mental disease may confuse a jury into thinking the opinions show more than they do. Because allowing mental-disease evidence on *mens rea* can thus easily mislead, it is not unreasonable to address that tendency by confining consideration of this kind of evidence to insanity, on which a defendant may be assigned the burden of persuasion.

There are, finally, particular risks inherent in the opinions of the experts who supplement the mental-disease classifications with opinions on incapacity: on whether the mental disease rendered a particular defendant incapable of the cognition necessary for moral judgment or *mens rea* or otherwise incapable of understanding the wrongfulness of the conduct charged. Unlike observational evidence bearing on *mens rea*, capacity evidence consists of judgment, and judgment fraught with multiple perils: a defendant's state of mind at the crucial moment can be elusive no matter how conscientious the enquiry, and the law's categories that set the terms of the capacity judgment are not the categories of psychology that govern the expert's professional thinking. Although such capacity judgments may be given in the utmost good faith, their potentially tenuous character is indicated by the candor of the defense

expert in this very case. Contrary to the State's expert, he
testified that Clark lacked the capacity to appreciate the
circumstances realistically and to understand the wrong-
fulness of what he was doing, App. 48–49, but he said that
"no one knows exactly what was on [his] mind" at the time
of the shooting, *id.*, at 48. And even when an expert is
confident that his understanding of the mind is reliable,
judgment addressing the basic categories of capacity
requires a leap from the concepts of psychology, which are
devised for thinking about treatment, to the concepts of
legal sanity, which are devised for thinking about criminal
responsibility. See Insanity Defense Work Group, Ameri-
can Psychiatric Association Statement on the Insanity
Defense, 140 Am. J. Psychiatry 681, 686 (1983), reprinted
in 2 The Role of Mental Illness in Criminal Trials 117, 122
(J. Moriarty ed. 2001) ("The American Psychiatric Associa-
tion is not opposed to legislatures restricting psychiatric
testimony about the . . . ultimate legal issues concerning
the insanity defense. . . . When . . . 'ultimate issue' ques-
tions are formulated by the law and put to the expert
witness who must then say 'yea' or 'nay,' then the expert
witness is required to make a leap in logic. He no longer
addresses himself to medical concepts but instead must
infer or intuit what is in fact unspeakable, namely, the
*probable relationship* between medical concepts and legal
or moral constructs such as free will. These impermissible
leaps in logic made by expert witnesses confuse the
jury. . . . This state of affairs does considerable injustice to
psychiatry and, we believe, possibly to criminal defen-
dants. These psychiatric disagreements . . . cause less
than fully understanding juries or the public to conclude
that psychiatrists cannot agree. In fact, in many criminal
insanity trials both prosecution and defense psychiatrists
do agree about the nature and even the extent of mental
disorder exhibited by the defendant at the time of the act"
(emphasis in original; footnote omitted)); DSM–IV–TR

xxxii–xxxiii; P. Giannelli & E. Imwinkelried, Scientific Evidence §9–3(B), p. 286 (1986) ("[N]o matter how the test for insanity is phrased, a psychiatrist or psychologist is no more qualified than any other person to give an opinion about whether a particular defendant's mental condition satisfies the legal test for insanity"); cf. R. Slovenko, Psychiatry and Criminal Culpability 55 (1995) ("The scope of the DSM is wide-ranging and includes 'conduct disorders' but 'evil' is not mentioned"). In sum, these empirical and conceptual problems add up to a real risk that an expert's judgment in giving capacity evidence will come with an apparent authority that psychologists and psychiatrists do not claim to have. We think that this risk, like the difficulty in assessing the significance of mental-disease evidence, supports the State's decision to channel such expert testimony to consideration on the insanity defense, on which the party seeking the benefit of this evidence has the burden of persuasion.

It bears repeating that not every State will find it worthwhile to make the judgment Arizona has made, and the choices the States do make about dealing with the risks posed by mental-disease and capacity evidence will reflect their varying assessments about the presumption of sanity as expressed in choices of insanity rules.[44] The point here simply is that Arizona has sensible reasons to assign the risks as it has done by channeling the evidence.[45]

---

[44] A State in which the burden of persuasion as to a defendant's sanity lies with the prosecution might also be justified in restricting mental-disease and capacity evidence to insanity determinations owing to the potential of mental-disease evidence to mislead and the risk of misjudgment inherent in capacity evidence. We need not, in the context of this case, address that issue.

[45] Arizona's rule is supported by a further practical reason, though not as weighty as those just considered. As mentioned before, if substantial mental-disease and capacity evidence is accepted as rebutting *mens rea* in a given case, the affirmative defense of insanity will proba-

### F

Arizona's rule serves to preserve the State's chosen standard for recognizing insanity as a defense and to avoid confusion and misunderstanding on the part of jurors.[46] For these reasons, there is no violation of due process under *Chambers* and its progeny, and no cause to claim that channeling evidence on mental disease and capacity offends any "'principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,'" *Patterson,* 432 U. S., at 202 (quoting *Speiser,* 357 U. S., at 523).

\*     \*     \*

The judgment of the Court of Appeals of Arizona is, accordingly, affirmed.

*It is so ordered.*

---

bly not be reached or ruled upon; the defendant will simply be acquitted (or perhaps convicted of a lesser included offense). If an acquitted defendant suffers from a mental disease or defect that makes him dangerous, he will neither be confined nor treated psychiatrically unless a judge so orders after some independent commitment proceeding. But if a defendant succeeds in showing himself insane, Arizona law (and presumably that of every other State with an insanity rule) will require commitment and treatment as a consequence of that finding without more. It makes sense, then, to channel capacity evidence to the issue structured to deal with mental incapacity when such a claim is raised successfully. See, *e.g.*, *Jones,* 463 U. S., at 368 ("The purpose of commitment following an insanity acquittal . . . is to treat the individual's mental illness and protect him and society from his potential dangerousness").

[46] The rule also deals in a practical way with those whose insanity has been shown to make them dangerous to others. See n. 45, *supra.*

# SUPREME COURT OF THE UNITED STATES

No. 05–5966

## ERIC MICHAEL CLARK, PETITIONER *v.* ARIZONA

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF
ARIZONA, DIVISION ONE

[June 29, 2006]

JUSTICE BREYER, concurring in part and dissenting in
part.

As I understand the Court's opinion, it distinguishes
among three categories of evidence related to insanity: (1)
fact-related evidence as to the defendant's specific state of
mind at the time of the crime, *e.g.*, evidence that shows he
thought the policeman was not a human being; (2) expert
opinion evidence that the defendant suffered from a men-
tal disease that would have affected his capacity to form
an intent to kill a policeman, *e.g.*, that he suffers from a
disease of a kind where powerful voices command the
sufferer to kill; and (3) expert opinion evidence that the
defendant was legally insane, *e.g.*, evidence that he did not
know right from wrong. *Ante*, at 16–18.

I agree with the Court's basic categorization. I also
agree that the Constitution permits a State to provide for
consideration of the second and third types of evidence
solely in conjunction with the insanity defense. A State
might reasonably fear that, without such a rule, the types
of evidence as to intent would become confused in the
jury's mind, indeed that in some cases the insanity ques-
tion would displace the intent question as the parties
litigate both simultaneously.

Nonetheless, I believe the distinction among these
kinds of evidence will be unclear in some cases. And
though I accept the majority's reading of the record, I

remain concerned as to whether the lower courts, in set-
ting forth and applying *State* v. *Mott*, 187 Ariz. 536, 931
P. 2d 1046 (en banc), cert. denied, 520 U. S. 1234 (1997),
focused with sufficient directness and precision upon the
distinction.

Consequently, I would remand this case so that Ari-
zona's courts can determine whether Arizona law, as set
forth in *Mott* and other cases, is consistent with the dis-
tinction the Court draws and whether the trial court so
applied Arizona law here.  I would also reserve the ques-
tion (as I believe the Court has done) as to the burden of
persuasion in a case where the defendant produces suffi-
cient evidence of the second kind as to raise a reasonable
doubt suggesting that he suffered from a mental illness so
severe as to prevent him from forming any relevant intent
at all.

For this reason, I dissent only from Parts III–B and III–
C of the Court's opinion and the ultimate disposition of
this case, and I join the remainder.

# SUPREME COURT OF THE UNITED STATES

No. 05–5966

ERIC MICHAEL CLARK, PETITIONER *v.* ARIZONA

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF
ARIZONA, DIVISION ONE

[June 29, 2006]

JUSTICE KENNEDY, with whom JUSTICE STEVENS and JUSTICE GINSBURG join, dissenting.

In my submission the Court is incorrect in holding that Arizona may convict petitioner Eric Clark of first-degree murder for the intentional or knowing killing of a police officer when Clark was not permitted to introduce critical and reliable evidence showing he did not have that intent or knowledge. The Court is wrong, too, when it concludes the issue cannot be reached because of an error by Clark's counsel. Its reasons and conclusions lead me to file this respectful dissent.

Since I would reverse the judgment of the Arizona Court of Appeals on this ground, and the Arizona courts might well alter their interpretation of the State's criminal responsibility statute were my rationale to prevail, it is unnecessary for me to address the argument that Arizona's definition of insanity violates due process.

I

Clark claims that the trial court erred in refusing to consider evidence of his chronic paranoid schizophrenia in deciding whether he possessed the knowledge or intent required for first-degree murder. Seizing upon a theory invented here by the Court itself, the Court narrows Clark's claim so he cannot raise the point everyone else thought was involved in the case. The Court says the only

issue before us is whether there is a right to introduce mental-disease evidence or capacity evidence, not a right to introduce observation evidence. See *ante,* at 15–25. This restructured evidentiary universe, with no convincing authority to support it, is unworkable on its own terms. Even were that not so, however, the Court's tripartite structure is something not addressed by the state trial court, the state appellate court, counsel on either side in those proceedings, or the briefs the parties filed with us. The Court refuses to consider the key part of Clark's claim because his counsel did not predict the Court's own invention. It is unrealistic, and most unfair, to hold that Clark's counsel erred in failing to anticipate so novel an approach. If the Court is to insist on its approach, at a minimum the case should be remanded to determine whether Clark is bound by his counsel's purported waiver.

The Court's error, of course, has significance beyond this case. It adopts an evidentiary framework that, in my view, will be unworkable in many cases. The Court classifies Clark's behavior and expressed beliefs as observation evidence but insists that its description by experts must be mental-disease evidence or capacity evidence. See *ante,* at 16–18. These categories break down quickly when it is understood how the testimony would apply to the question of intent and knowledge at issue here. The most common type of schizophrenia, and the one Clark suffered from, is paranoid schizophrenia. See P. Berner et al., Diagnostic Criteria for Functional Psychoses 37 (2d ed. 1992). The existence of this functional psychosis is beyond dispute, but that does not mean the lay witness understands it or that a disputed issue of fact concerning its effect in a particular instance is not something for the expert to address. Common symptoms of the condition are delusions accompanied by hallucinations, often of the auditory type, which can cause disturbances of perception. *Ibid.* Clark's expert testified that people with schizophrenia

often play radios loudly to drown out the voices in their heads. See App. 32. Clark's attorney argued to the trial court that this, rather than a desire to lure a policeman to the scene, explained Clark's behavior just before the killing. *Id.,* at 294–295. The observation that schizophrenics play radios loudly is a fact regarding behavior, but it is only a relevant fact if Clark has schizophrenia.

Even if this evidence were, to use the Court's term, mental-disease evidence, because it relies on an expert opinion, what would happen if the expert simply were to testify, without mentioning schizophrenia, that people with Clark's symptoms often play the radio loudly? This seems to be factual evidence, as the term is defined by the Court, yet it differs from mental-disease evidence only in forcing the witness to pretend that no one has yet come up with a way to classify the set of symptoms being described. More generally, the opinion that Clark had paranoid schizophrenia—an opinion shared by experts for both the prosecution and defense—bears on efforts to determine, as a factual matter, whether he knew he was killing a police officer. The psychiatrist's explanation of Clark's condition was essential to understanding how he processes sensory data and therefore to deciding what information was in his mind at the time of the shooting. Simply put, knowledge relies on cognition, and cognition can be affected by schizophrenia. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 299 (4th ed. text rev. 2000) ("The characteristic symptoms of Schizophrenia involve a range of cognitive and emotional dysfunctions that include perception"); *ibid.* (Symptoms include delusions, which are "erroneous beliefs that usually involve a misinterpretation of perceptions or experiences"). The mental-disease evidence at trial was also intertwined with the observation evidence because it lent needed credibility. Clark's parents and friends testified Clark thought the people in his town were aliens

trying to kill him. These claims might not be believable without a psychiatrist confirming the story based on his experience with people who have exhibited similar behaviors. It makes little sense to divorce the observation evidence from the explanation that makes it comprehensible.

Assuming the Court's tripartite structure were feasible, the Court is incorrect when it narrows Clark's claim to exclude any concern about observation evidence. In deciding Clark's counsel failed to raise this issue, the Court relies on a series of perceived ambiguities regarding how the claim fits within the Court's own categories. See *ante,* at 15–25. The Court cites no precedent for construing these ambiguities against the claimant and no prudential reason for ignoring the breadth of Clark's claim. It is particularly surprising that the Court does so to the detriment of a criminal defendant asserting the fundamental challenge that the trier of fact refused to consider critical evidence showing he is innocent of the crime charged.

The alleged ambiguities are, in any event, illusory. The evidence at trial addressed more than the question of general incapacity or opinions regarding mental illness; it went further, as it included so-called observation evidence relevant to Clark's mental state at the moment he shot the officer. There was testimony, for example, that Clark thought the people in his town, particularly government officials, were not human beings but aliens who were trying to kill him. See App. 119–121, 131–132, 192–197, 249–256; Tr. of Bench Trial in No. CR–2000–538, pp. 110–112, 131–132, 136, 226–228 (Aug. 20, 2003); *id.,* at 24–25, 59–60 (Aug. 21, 2003). The Court recognizes the existence of this essential observation evidence. See *ante,* at 16–17.

The Court holds, nonetheless, that "we cannot be sure" whether the trial court failed to consider this evidence. *Ante,* at 24. It is true the trial court ruling was not perfectly clear. Its language does strongly suggest, though, that it did not consider any of this testimony in deciding

whether Clark had the knowledge or intent required for first-degree murder. After recognizing that "much of the evidence that [the defense is] going to be submitting, in fact all of it, as far as I know . . . that has to do with the insanity could also arguably be made . . . as to form and intent and his capacity for the intent," the court concluded "we will be focusing, as far as I'm concerned, strictly on the insanity defense." App. 9. In announcing its verdict, the trial court did not mention any of the mental-illness evidence, observation or otherwise, in deciding Clark's guilt. *Id.,* at 331–335. The most reasonable assumption, then, would seem to be that the trial court did not consider it, and the Court does not hold otherwise. See *ante,* at 20.

Clark's objection to this refusal by the trier of fact to consider the evidence as it bore on his key defense was made at all stages of the proceeding. In his post-trial motion to vacate the judgment, Clark argued that "prohibiting consideration of *any* evidence reflecting upon a mentally ill criminal defendant's ability to form the necessary *mens rea* violates due process." Record, Doc. 406, p. 8. Clark pressed the same argument in the Arizona Court of Appeals. See Appellant's Opening Brief in No. 1CA–CR–03–0851 etc., pp. 46–52 (hereinafter Appellant's Opening Brief). He also noted that the trial judge had erred in refusing to consider non-expert testimony—presumably what the Court would call observation evidence—on Clark's mental illness. *Id.,* at 47–48. ("The trial court therefore violated [Clark's] right to present a defense because [the] court refused to consider *any evidence*, including the multiple testimonials of *lay* witnesses . . . in deciding whether he could form the requisite *mens rea*"). The appeals court decided the issue on the merits, holding that the trial court was correct not to consider the evidence of mental illness in determining whether Clark had the *mens rea* for first-degree murder. See App. 351–353. It offered no distinction at all between observation or

mental-disease evidence.

Notwithstanding the appeals court's decision, the Court states that the issue was not clearly presented to the state courts. See *ante,* at 21–24. According to the Court, Clark only raised an objection based on *State* v. *Mott*, 187 Ariz. 536, 931 P. 2d 1046 (1997) (en banc), see *ante,* at 21–24, and *Mott*'s holding was limited to the exclusion of mental-disease and capacity evidence, see *ante,* at 19. The Court is incorrect, and on both counts.

First, Clark's claim goes well beyond an objection to *Mott*. In fact, he specifically attempted to distinguish *Mott* by noting that the trial court in this case refused to consider all evidence of mental illness. See Record, Doc. 406, at 8; see also Appellant's Opening Brief 48. The Court notices these arguments but criticizes Clark's counsel for not being specific about the observation evidence he wanted the trial court to consider. See *ante,* at 22. There was no reason, though, for Clark's counsel to believe additional specificity was required, since there was no evident distinction in Arizona law between observation evidence and mental-disease testimony.

Second, *Mott*'s holding was not restricted to mental-disease evidence. The Arizona Supreme Court did not refer to any distinction between observation and mental-disease evidence, or lay and expert testimony. Its holding was stated in broad terms: "Arizona does not allow evidence of a defendant's mental disorder short of insanity either as an affirmative defense or to negate the *mens rea* element of a crime." 187 Ariz., at 541, 931 P. 2d, at 1051; see *id.,* at 540, 931 P. 2d, at 1050 ("The legislature's decision . . . evidences its rejection of the use of psychological testimony to challenge the *mens rea* element of a crime"). The Court attempts to divine a fact/opinion distinction in *Mott* based on *Mott*'s distinguishing a case, *State* v. *Christensen*, 129 Ariz. 32, 628 P. 2d 580 (1981) (in banc), where evidence about behavioral tendencies was deemed admissible. See

*ante,* at 19. *Christensen*, though, also addressed an expert opinion; the difference was that the evidence there concerned a "character trait of acting reflexively in response to stress," not a mental illness. *Mott, supra,* at 544, 931 P. 2d, at 1054. Since the Court recognizes the Arizona Court of Appeals relied on *Mott*, the expansive rule of exclusion in *Mott*—without any suggestion of a limitation depending on the kind of evidence—should suffice for us to reach the so-called observation-evidence issue. Even if, as the Court contends, see *ante,* at 15, *Mott* is limited to expert testimony, the Court's categories still do not properly interpret *Mott*, because the Court's own definition of observation evidence includes some expert testimony, see *ante,* at 17.

It makes no difference that in the appeals court Clark referred to the issue as inability to form knowledge or intent. See Appellant's Opening Brief 46–52. He did not insist on some vague, general incapacity. He stated, instead, that he "suffered from a major mental illness and was psychotic at the time of the offense." *Id.,* at 48. Even if Clark's arguments were insufficient to apprise the state court of the argument, "[o]ur traditional rule is that '[o]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.'" *Lebron* v. *National Railroad Passenger Corporation,* 513 U. S. 374, 379 (1995) (quoting *Yee* v. *Escondido,* 503 U. S. 519, 534 (1992)). The claim is clear. Though it seems to be obscure to this Court, it was understood by the Arizona Court of Appeals, which stated: "Clark argues that the trial court erred in refusing to consider evidence of his mental disease or defect in determining whether he had the requisite *mens rea* to commit first-degree murder." App. 351. When the question is what the state court held, it is not instructive for this Court to recast the words the state court used.

The razor-thin distinction the Court draws between

evidence being used to show incapacity and evidence being used to show lack of *mens rea* directly does not identify two different claims. Clark's single claim, however characterized, involves the use of the same mental-illness evidence to decide whether he had the requisite knowledge or intent. The various ways in which the evidence is relevant in disproving *mens rea* hardly qualify as separate claims. The new arguments allowed in *Lebron* and *Yee*, by comparison, were far more disconnected from the initial bases for the alleged violations. See *Lebron, supra*, at 378, 379 (for purposes of showing state action, petitioner could argue that Amtrak was a Government entity even though he argued below only that it was a private entity with close connections to Government entities, because the claim was simply "that Amtrak did not accord him the rights it was obliged to provide by the First Amendment"); *Yee, supra*, at 534, 535 (petitioners could argue that an ordinance constituted a regulatory taking, even though they arguably asserted in the Court of Appeals only a physical taking, because the claim was simply "that the ordinance effects an unconstitutional taking"). If we give this latitude to litigants in civil cases, surely we must do so here. Furthermore, to the extent any ambiguity remains on whether the claim was raised, the proper course is to remand. See *Bradshaw* v. *Richey,* 546 U. S. ___, ___ (2005) (slip op., at 6) *(per curiam).* Unless the state court clearly decides an issue on state-law grounds, which the Court does not contend occurred here, there is no bar to our review of the federal question. See *Harris* v. *Reed,* 489 U. S. 255, 261–262 (1989).

Before this Court Clark framed the issue in broad terms that encompass the question whether the evidence of his mental illness should have been considered to show he did not at the time of the offense have the knowledge or intent to shoot a police officer. See Brief for Petitioner i ("Questions Presented for Review: (1) Whether Arizona's blanket

exclusion of evidence and refusal to consider mental disease or defect to rebut the state's evidence on the element of *mens rea* violated Petitioner's right to due process under the United States Constitution, Fourteenth Amendment?"), 22 ("Here, the trial court held that under the *Mott* rule it was obliged to find as a fact that [Clark] knew he was shooting a police officer to death—a necessary factual element of the only form of first degree murder charged against [Clark]—while simultaneously refusing to consider [Clark's] evidence that an acute episode of his chronic paranoid schizophrenic illness prevented him from actually having that knowledge" (emphasis omitted)), 31–32 (the Arizona courts erred in holding Clark "could be punished as though he had this knowledge and intent although he may not in fact have had either"); Reply Brief for Petitioner 3 (challenging the trial judge's refusal "to give any consideration to the mental-illness evidence in making his factual findings as to whether [Clark] did or did not act with the state of mind required for a first-degree murder conviction"). An entire section of Clark's opening brief argues that the evidence of mental illness should have been considered to rebut the prosecution's inference of knowledge or intent from the factual circumstances of the crime. See Brief for Petitioner 13–21. This line of argument concerns facts of behavior and amounts to more than a claim of general incapacity.

Clark seeks resolution of issues that can be complex and somewhat overlapping. In the end, however, we must decide whether he had the right to introduce evidence showing he lacked the intent or knowledge the statute itself sets forth in describing a basic element of the crime. Clark has preserved this issue at all stages, including in this Court.

## II

Clark was charged with first-degree murder for the shoot-

ing of Officer Jeffrey Moritz.  "A person commits first-degree murder if," as relevant here, "[i]ntending or knowing that the person's conduct will cause death to a law enforcement officer, the person causes the death of a law enforcement officer who is in the line of duty."  Ariz. Rev. Stat. Ann. §13–1105(A)(3) (West Supp. 2005).  Clark challenges the trial court's refusal to consider any evidence of mental illness, from lay or expert testimony, in determining whether he acted with the knowledge or intent element of the crime.  See App. 9; see also *Mott,* 187 Ariz., at 541, 931 P. 2d, at 1051.

States have substantial latitude under the Constitution to define rules for the exclusion of evidence and to apply those rules to criminal defendants.  See *United States* v. *Scheffer,* 523 U. S. 303, 308 (1998).  This authority, however, has constitutional limits.  "'Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense."'"  *Holmes* v. *South Carolina,* 547 U. S. ___, ___ (2006) (slip op., at 4) (quoting *Crane* v. *Kentucky,* 476 U. S. 683, 690 (1986), in turn quoting *California* v. *Trombetta,* 467 U. S. 479, 485 (1984)).  "This right is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are '"arbitrary" or "disproportionate to the purposes they are designed to serve."'"  *Holmes, supra*, at ___ (slip op., at 4) (quoting *Scheffer, supra,* at 308, in turn quoting *Rock* v. *Arkansas,* 483 U. S. 44, 58, 56 (1987)).

The central theory of Clark's defense was that his schizophrenia made him delusional.  He lived in a universe where the delusions were so dominant, the theory was, that he had no intent to shoot a police officer or knowledge he was doing so.  It is one thing to say he acted with intent or knowledge to pull the trigger.  It is quite

another to say he pulled the trigger to kill someone he knew to be a human being and a police officer. If the trier of fact were to find Clark's evidence sufficient to discount the case made by the State, which has the burden to prove knowledge or intent as an element of the offense, Clark would not be guilty of first-degree murder under Arizona law.

The Court attempts to diminish Clark's interest by treating mental-illness evidence as concerning only "judgment," rather than fact. *Ante,* at 36. This view appears to derive from the Court's characterization of Clark's claim as raising only general incapacity. See *ibid.* This is wrong for the reasons already discussed. It fails to recognize, moreover, the meaning of the offense element in question here. The *mens rea* element of intent or knowledge may, at some level, comprise certain moral choices, but it rests in the first instance on a factual determination. That is the fact Clark sought to put in issue. Either Clark knew he was killing a police officer or he did not.

The issue is not, as the Court insists, whether Clark's mental illness acts as an "excuse from customary criminal responsibility," *ante,* at 30, but whether his mental illness, as a factual matter, made him unaware that he was shooting a police officer. If it did, Clark needs no excuse, as then he did not commit the crime as Arizona defines it. For the elements of first-degree murder, where the question is knowledge of particular facts—that one is killing a police officer—the determination depends not on moral responsibility but on empirical fact. Clark's evidence of mental illness had a direct and substantial bearing upon what he knew, or thought he knew, to be the facts when he pulled the trigger; this lay at the heart of the matter.

The trial court's exclusion was all the more severe because it barred from consideration on the issue of *mens rea* all this evidence, from any source, thus preventing Clark from showing he did not commit the crime as defined by

Arizona law. Quite apart from due process principles, we have held that a bar of this sort can be inconsistent with the Confrontation Clause. See *Delaware* v. *Van Arsdall,* 475 U. S. 673 (1986). In *Van Arsdall* the Court held a state court erred in making a ruling that "prohibited *all* inquiry into" an event. *Id.,* at 679. At issue was a line of defense questioning designed to show the bias of a prosecution witness. In the instant case the ruling in question bars from consideration all testimony from all witnesses necessary to present the argument that was central to the whole case for the defense: a challenge to the State's own proof on an element of the crime. The Due Process and Compulsory Process Clauses, and not the Confrontation Clause, may be the controlling standard; but the disability imposed on the accused is every bit as substantial and pervasive here as it was in *Van Arsdall.*

Arizona's rule is problematic because it excludes evidence no matter how credible and material it may be in disproving an element of the offense. The Court's cases have noted the potential arbitrariness of *per se* exclusions and, on this rationale, have invalidated various state prohibitions. See *Holmes, supra*, at ___ (slip op., at 9) (rule excluding, in certain cases, evidence that a third party may have committed the crime "even if that evidence, if viewed independently, would have great probative value and even if it would not pose an undue risk of harassment, prejudice, or confusion of the issues"); *Rock, supra*, at 56 (rule excluding all hypnotically refreshed testimony "operates to the detriment of any defendant who undergoes hypnosis, without regard to the reasons for it, the circumstances under which it took place, or any independent verification of the information it produced"); *Washington* v. *Texas,* 388 U. S. 14, 22 (1967) (rule excluding accomplice testimony "prevent[s] whole categories of defense witnesses from testifying on the basis of *a priori* categories that presume them unworthy of belief").

This is not to suggest all general rules on the exclusion of certain types of evidence are invalid. If the rule does not substantially burden the defense, then it is likely permissible. See *Scheffer,* 523 U. S., at 316–317 (upholding exclusion of polygraph evidence in part because this rule "does not implicate any significant interest of the accused"); *id.,* at 318 (KENNEDY, J., concurring in part and concurring in judgment) ("[S]ome later case might present a more compelling case for introduction of the testimony than this one does"). Where, however, the burden is substantial, the State must present a valid reason for its *per se* evidentiary rule.

In the instant case Arizona's proposed reasons are insufficient to support its categorical exclusion. While the State contends that testimony regarding mental illness may be too incredible or speculative for the jury to consider, this does not explain why the exclusion applies in all cases to all evidence of mental illness. "A State's legitimate interest in barring unreliable evidence does not extend to *per se* exclusions that may be reliable in an individual case." *Rock,* 483 U. S., at 61. States have certain discretion to bar unreliable or speculative testimony and to adopt rules to ensure the reliability of expert testimony. Arizona has done so, and there is no reason to believe its rules are insufficient to avoid speculative evidence of mental illness. See Ariz. Rules of Evid. 403, 702 (West 2005). This is particularly true because Arizona applies its usual case-by-case approach to permit admission of evidence of mental illness for a variety of other purposes. See, *e.g., State* v. *Lindsey*, 149 Ariz. 472, 474–475, 720 P. 2d 73, 74–75 (1986) (en banc) (psychological characteristics of molestation victims); *State* v. *Hamilton*, 177 Ariz. 403, 408–410, 868 P. 2d 986, 991–993 (App. 1993) (psychological evidence of child abuse accommodation syndrome); *Horan* v. *Indus. Comm'n*, 167 Ariz. 322, 325–326, 806 P. 2d 911, 914–915 (App. 1991) (psychiatric

testimony regarding neurological deficits).

The risk of jury confusion also fails to justify the rule. The State defends its rule as a means to avoid the complexities of determining how and to what degree a mental illness affects a person's mental state. The difficulty of resolving a factual issue, though, does not present a sufficient reason to take evidence away from the jury even when it is crucial for the defense. "We have always trusted juries to sort through complex facts in various areas of law." *United States* v. *Booker,* 543 U. S. 220, 289 (2005) (STEVENS, J., dissenting in part). Even were the risk of jury confusion real enough to justify excluding evidence in most cases, this would provide little basis for prohibiting all evidence of mental illness without any inquiry into its likely effect on the jury or its role in deciding the linchpin issue of knowledge and intent. Indeed, Arizona has a rule in place to serve this very purpose. See Ariz. Rule of Evid. 403.

Even assuming the reliability and jury-confusion justifications were persuasive in some cases, they would not suffice here. It does not overcome the constitutional objection to say that an evidentiary rule that is reasonable on its face can be applied as well to bar significant defense evidence without any rational basis for doing so. In *Van Arsdall,* for example, the Court rejected the application of Delaware Rule of Evidence 403, which allows relevant evidence to be excluded where its probative value is substantially outweighed by the risk of unfair prejudice or other harms to the trial process. 475 U. S., at 676, and n. 2. While the Rule is well established and designed for a legitimate function, the Constitution prevented an application that deprived the defendant of all inquiry into an important issue. *Id.,* at 679. Other cases have applied this same case-specific analysis in deciding the legitimacy of an exclusion. See, *e.g., Rock, supra,* at 62 (the "circumstances present an argument for admissibility of petitioner's testimony in this particular case, an argument that must be considered by the

trial court"); *Chambers* v. *Mississippi,* 410 U. S. 284, 302 (1973) ("In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice"); cf. *Scheffer,* 523 U. S., at 318 (KENNEDY, J., concurring in part and concurring in judgment).

The Court undertakes little analysis of the interests particular to this case. By proceeding in this way it devalues Clark's constitutional rights. The reliability rationale has minimal applicability here. The Court is correct that many mental diseases are difficult to define and the subject of great debate. See *ante,* at 33–34. Schizophrenia, however, is a well-documented mental illness, and no one seriously disputes either its definition or its most prominent clinical manifestations. The State's own expert conceded that Clark had paranoid schizophrenia and was actively psychotic at the time of the killing. See App. 254–257. The jury-confusion rationale, if it is at all applicable here, is the result of the Court's own insistence on conflating the insanity defense and the question of intent. Considered on its own terms, the issue of intent and knowledge is a straightforward factual question. A trier of fact is quite capable of weighing defense testimony and then determining whether the accused did or did not intend to kill or knowingly kill a human being who was a police officer. True, the issue can be difficult to decide in particular instances, but no more so than many matters juries must confront.

The Court says mental-illness evidence "can easily mislead," *ante,* at 36, and may "tel[l] us little or nothing about the ability of the defendant to form *mens rea,*" *ante,* at 35. These generalities do not, however, show how relevant or misleading the evidence in this case would be (or explain why Arizona Rule of Evidence 403 is insufficient for weighing these factors). As explained above, the

evidence of Clark's mental illness bears directly on *mens rea*, for it suggests Clark may not have known he was killing a human being. It is striking that while the Court discusses at length the likelihood of misjudgment from placing too much emphasis on evidence of mental illness, see *ante,* at 33–38, it ignores the risk of misjudging an innocent man guilty from refusing to consider this highly relevant evidence at all. Clark's expert, it is true, said no one could know exactly what was on Clark's mind at the time of the shooting. See *ante,* at 37. The expert testified extensively, however, about the effect of Clark's delusions on his perceptions of the world around him, and about whether Clark's behavior around the time of the shooting was consistent with delusional thinking. This testimony was relevant to determining whether Clark knew he was killing a human being. It also bolstered the testimony of lay witnesses, none of which was deemed unreliable or misleading by the state courts.

For the same reasons, the Court errs in seeking support from the American Psychiatric Association's statement that a psychiatrist may be justifiably reluctant to reach legal conclusions regarding the defendant's mental state. See *ante,* at 37. In this very case, the American Psychiatric Association made clear that psychiatric evidence plays a crucial role regardless of whether the psychiatrist testifies on the ultimate issue: "Expert evidence of mental disorders, presented by qualified professionals and subject to adversarial testing, is both relevant to the mental-state issues raised by *mens rea* requirements and reliable. . . . Such evidence could not be condemned wholesale without unsettling the legal system's central reliance on such evidence." Brief for American Psychiatric Association et al. as *Amici Curiae* 15.

Contrary to the Court's suggestion, see *ante,* at 35–36, the fact that the state and defense experts drew different conclusions about the effect of Clark's mental illness on

his mental state only made Clark's evidence contested; it did not make the evidence irrelevant or misleading. The trial court was capable of evaluating the competing conclusions, as factfinders do in countless cases where there is a dispute among witnesses. In fact, the potential to mislead will be far greater under the Court's new evidentiary system, where jurors will receive observation evidence without the necessary explanation from experts.

The fact that mental-illness evidence may be considered in deciding criminal responsibility does not compensate for its exclusion from consideration on the *mens rea* elements of the crime. Cf. *ante,* at 33. The evidence addresses different issues in the two instances. Criminal responsibility involves an inquiry into whether the defendant knew right from wrong, not whether he had the *mens rea* elements of the offense. While there may be overlap between the two issues, "the existence or nonexistence of legal insanity bears no necessary relationship to the existence or nonexistence of the required mental elements of the crime." *Mullaney* v. *Wilbur,* 421 U. S. 684, 706 (1975) (Rehnquist, J., concurring).

Even if the analyses were equivalent, there is a different burden of proof for insanity than there is for *mens rea*. Arizona requires the defendant to prove his insanity by clear and convincing evidence. See Ariz. Rev. Stat. Ann. §13–502(C) (West 2001). The prosecution, however, must prove all elements of the offense beyond a reasonable doubt. See *Mullaney, supra*, at 703–704; *In re Winship,* 397 U. S. 358, 364 (1970). The shift in the burden on the criminal responsibility issue, while permissible under our precedent, see *Leland* v. *Oregon,* 343 U. S. 790 (1952), cannot be applied to the question of intent or knowledge without relieving the State of its responsibility to establish this element of the offense. See *Sandstrom* v. *Montana,* 442 U. S. 510, 524 (1979) (jury instruction that had the effect of placing the burden on the defendant to disprove that he had

the requisite mental state violates due process). While evidentiary rules do not generally shift the burden impermissibly, where there is a right to have evidence considered on an element of the offense, the right is not respected by allowing the evidence to come in only on an issue for which the defendant bears the burden of proof. See *Cool* v. *United States,* 409 U. S. 100, 103 (1972) *(per curiam)* (jury instruction that allowed jury to consider accomplice's testimony only if it was true beyond a reasonable doubt "places an improper burden on the defense and allows the jury to convict despite its failure to find guilt beyond a reasonable doubt"); *Martin* v. *Ohio,* 480 U. S. 228, 233–234 (1987) (State can shift the burden on a claim of self-defense, but if the jury were disallowed from considering self-defense evidence for purposes of deciding the elements of the offense, it "would relieve the State of its burden and plainly run afoul of *Winship*'s mandate"). By viewing the Arizona rule as creating merely a "presumption of sanity (or capacity or responsibility)," *ante,* at 30, rather than a presumption that the *mens rea* elements were not affected by mental illness, the Court fails to appreciate the implications for *Winship.*

The State attempts to sidestep the evidentiary issue entirely by claiming that its mental-illness exclusion simply alters one element of the crime. The evidentiary rule at issue here, however, cannot be considered a valid redefinition of the offense. Under the State's logic, a person would be guilty of first-degree murder if he knowingly or intentionally killed a police officer or committed the killing under circumstances that would show knowledge or intent but for the defendant's mental illness. To begin with, Arizona law does not say this. And if it did, it would be impermissible. States have substantial discretion in defining criminal offenses. In some instances they may provide that the accused has the burden of persuasion with respect to affirmative defenses. See *Patterson* v. *New*

*York,* 432 U. S. 197, 210 (1977). "But there are obviously constitutional limits beyond which the States may not go in this regard." *Ibid.* If it were otherwise, States could label all evidentiary exclusions as redefinitions and so evade constitutional requirements. There is no rational basis, furthermore, for criminally punishing a person who commits a killing without knowledge or intent only if that person has a mental illness. Cf. *Robinson* v. *California,* 370 U. S. 660, 666 (1962). The State attempts to bring the instant case within the ambit of *Montana* v. *Egelhoff,* 518 U. S. 37 (1996); but in *Egelhoff* the excluded evidence concerned voluntary intoxication, for which a person can be held responsible. Viewed either as an evidentiary rule or a redefinition of the offense, it was upheld because it "comports with and implements society's moral perception that one who has voluntarily impaired his own faculties should be responsible for the consequences." *Id.,* at 50 (plurality opinion). An involuntary mental illness does not implicate this justification.

Future dangerousness is not, as the Court appears to conclude, see *ante,* at 38–39, n. 45, a rational basis for convicting mentally ill individuals of crimes they did not commit. Civil commitment proceedings can ensure that individuals who present a danger to themselves or others receive proper treatment without unfairly treating them as criminals. The State presents no evidence to the contrary, and the Court ought not to imply otherwise.

The State gains little support from *Fisher* v. *United States,* 328 U. S. 463 (1946). There the defendant requested an instruction from the trial court that the jury consider his mental deficiencies in determining his capacity for premeditation and deliberation. *Id.,* at 470. The Court noted that "[i]n view of the status of the defense of partial responsibility in the District and the nation no contention is or could be made of the denial of due process." *Id.,* at 466. This dictum may be attributable to the

fact that the cases recognizing a defendant's evidentiary rights and the prosecution's duty to prove all elements beyond a reasonable doubt were still decades away. It may also reflect the fact that the jury instructions as given did seem to allow the jury to consider evidence of mental deficiency if it disproved the elements of the offense. See *id.,* at 467, n. 3 (The jury instructions stated, "'It is further contended that even if sane and responsible, there was no deliberate intent to kill, nor in fact any actual intent to kill. Therefore if not guilty by reason of insanity, the defendant at most is guilty only of second degree murder or manslaughter'"). Even further ambiguity comes from the fact that the defense in *Fisher* concerned a claim that the petitioner was "mentally somewhat below the average" with a "psychopathic personality" of aggression. *Id.,* at 467. This general claim of mental deficiencies was relevant to the "theory of partial responsibility," *id.,* at 470, he wanted the jury to consider. Unlike the mental illness here, though, which concerns inadequacy of perception and information processing, the petitioner's claim may not have been relevant to *mens rea* unless *mens rea* were redefined to include an element of responsibility. *Fisher*'s language, then, does not control this case.

While Arizona's rule is not unique, either historically or in contemporary practice, this fact does not dispose of Clark's constitutional argument. To the extent *Fisher* may have suggested the contrary, subsequent cases make clear that while the existence of the rule in some jurisdictions is a significant factor to consider, see *Egelhoff, supra*, at 43 (plurality opinion), it is not dispositive for evaluation of a claim that the accused was foreclosed from introducing evidence crucial to the defense. The evidentiary exclusion of accomplice testimony the Court invalidated in *Washington* was, in fact, well established. See 388 U. S., at 21–22. The exclusion of hypnotically refreshed testimony likewise had some support when the Court held it

unconstitutional as applied to a defendant's own testimony. *Rock,* 483 U. S., at 57. While 13 States still impose significant restrictions on the use of mental-illness evidence to negate *mens rea*, a substantial majority of the States currently allow it. Brief for United States as *Amicus Curiae* 22–23, and n. 13. The fact that a reasonable number of States restrict this evidence weighs into the analysis, but applying the rule as a *per se* bar, as Arizona does, is so plainly unreasonable that it cannot be sustained.

Putting aside the lack of any legitimate state interest for application of the rule in this case, its irrationality is apparent when considering the evidence that is allowed. See *Washington, supra,* at 22 ("The absurdity of the rule is amply demonstrated by the exceptions that have been made to it"). Arizona permits the defendant to introduce, for example, evidence of "behavioral tendencies" to show he did not have the required mental state. See *Mott,* 187 Ariz., at 544, 931 P. 2d, at 1054; *Christensen,* 129 Ariz., at 35–36, 628 P. 2d, at 583–584. While defining mental illness is a difficult matter, the State seems to exclude the evidence one would think most reliable by allowing unexplained and uncategorized tendencies to be introduced while excluding relatively well-understood psychiatric testimony regarding well-documented mental illnesses. It is unclear, moreover, what would have happened in this case had the defendant wanted to testify that he thought Officer Moritz was an alien. If disallowed, it would be tantamount to barring Clark from testifying on his behalf to explain his own actions. If allowed, then Arizona's rule would simply prohibit the corroboration necessary to make sense of Clark's explanation. In sum, the rule forces the jury to decide guilt in a fictional world with undefined and unexplained behaviors but without mental illness. This rule has no rational justification and imposes a significant burden upon a straightforward defense: He did not commit

the crime with which he was charged.

These are the reasons for my respectful dissent.